*This opinion is subject to revision before
publication in the Pacific Reporter*

**2015 UT 88**

IN THE

SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

MARTIN CAMERON BOND,
*Appellant.*

No. 20130361
Filed September 30, 2015

Fourth District, American Fork
The Honorable Thomas Low
No. 101101667

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

Jennifer Gowans Vandenberg, Park City, for appellant

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
and JUSTICE DURHAM joined.

JUSTICE PARRISH sat for oral argument. Due to her resignation from
this court, however, she did not participate herein.

JUSTICE HIMONAS, opinion of the Court:

**INTRODUCTION**

¶ 1    A jury convicted Martin Bond of several heinous crimes,
including aggravated kidnapping and aggravated murder.
Mr. Bond challenges his convictions on three grounds. First, he
argues the prosecutor committed misconduct by calling Benjamin
Rettig, Mr. Bond's codefendant, to testify when Mr. Rettig had
indicated an intention to invoke his Fifth Amendment privilege
against self-incrimination and, therefore, the trial court abused its

discretion in denying his motion for a mistrial.[1] Second, he contends the prosecutor violated his rights under the Confrontation Clause by using leading questions in questioning Mr. Rettig. Third, he asserts his lawyers were ineffective for failing to move to merge the conviction for aggravated kidnapping with the conviction for aggravated murder.

¶ 2  We reject each ground and affirm Mr. Bond's convictions. With respect to the first ground, Mr. Bond failed to establish that the prosecutor committed misconduct in calling Mr. Rettig to the stand. Consequently, the trial court did not abuse its discretion in denying his motion for a mistrial. As to the second ground, we take this opportunity to clear up a point of significant confusion in our case law and expressly hold that the burden of demonstrating prejudice for an unpreserved federal constitutional claim rests with the defendant on appeal. And because Mr. Bond did not demonstrate prejudice from the prosecutor's leading questions, he failed to meet his burden. Finally, Mr. Bond's third ground—that trial counsel were deficient for failing to move for merger of the aggravated kidnapping and aggravated murder conviction—fails because such a motion would have been futile.

## BACKGROUND

¶ 3  In 2009, Mr. Bond and Mr. Rettig formed a plan to steal guns from the home of Mr. Bond's family friend, Kay Mortensen.[2] On November 16, 2009, the pair drove from Vernal to Mr. Mortensen's home in Payson carrying zip ties, latex gloves, and a .40 caliber handgun. When they arrived at the home, Mr. Mortensen answered the door and, recognizing Mr. Bond,

---

[1] Mr. Rettig pled guilty to aggravated murder and aggravated kidnapping for his role in the crimes. He now challenges his guilty pleas in a separate appeal currently pending before this court. *State v. Rettig*, no. 20131024. Mr. Rettig's appeal does not affect our disposition of Mr. Bond's case.

[2] "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations omitted) (internal quotation marks omitted).

invited both men into his home. According to Mr. Bond, Mr. Rettig then threatened Mr. Mortensen with the handgun, zip-tied his wrists, and demanded that Mr. Mortensen tell them where the guns were kept. Mr. Mortensen showed the men to a locked bunker in the backyard.

¶ 4    Mr. Bond and Mr. Rettig then led Mr. Mortensen back inside and up the stairs to the bathroom. Mr. Mortensen's ankles were zip-tied together and he was forced to kneel over the bathtub. One of the men went to the kitchen downstairs and retrieved a butcher knife, which was then used to slit Mr. Mortensen's throat and stab him through the back of the neck, killing him.

¶ 5    Almost immediately after the murder, Mr. Mortensen's son and daughter-in-law, Roger and Pamela Mortensen, arrived at the home. Mr. Bond and Mr. Rettig forced them into the living room and bound their wrists and ankles with zip ties. Mr. Bond threatened to "come after" the couple's family if they revealed the men's identity to the police. Mr. Bond and Mr. Rettig left with approximately twenty stolen guns. The couple freed themselves from the zip ties, called the police, and discovered Mr. Mortensen's body upstairs.

¶ 6    After leaving the house, Mr. Bond and Mr. Rettig returned to Vernal and parted ways. Mr. Bond kept all of the stolen guns. He stored some in his home, sold others, and buried the remaining weapons in a local park.

¶ 7    Approximately one year after the crime, Mr. Bond's ex-wife contacted the Utah County Sheriff's Office. She told police that Mr. Bond had confessed his role in the robbery and murder of Mr. Mortensen and had enlisted her help to bury some of the stolen guns. Police obtained a warrant to search Mr. Bond's home. While executing the warrant, police interviewed Mr. Bond and found several of the stolen guns. After the police confronted Mr. Bond with the guns, he admitted his involvement, implicated Mr. Rettig, and led police to a park where the remaining guns were buried. Police then arrested Mr. Bond and Mr. Rettig.

¶ 8    Mr. Bond gave several very different accounts of the robbery and murder before trial. He told his ex-wife that he held the handgun while Mr. Rettig murdered Mr. Mortensen with the knife. When police searched his home, Mr. Bond initially denied any involvement in the crime. But after police confronted him

with the stolen guns found in his home, Mr. Bond related a story similar to the one he told his ex-wife—that Mr. Rettig had killed Mr. Mortensen. And in subsequent police interviews, Mr. Bond continued to assert that Mr. Rettig had stabbed and killed Mr. Mortensen. Then, while in prison, Mr. Bond passed notes to another inmate in which he claimed that he had killed Mr. Mortensen but that Mr. Rettig forced him to do so by threatening him with the gun.

¶ 9 The State charged Mr. Bond with one count of aggravated murder, three counts of aggravated kidnapping, one count of aggravated burglary, and one count of aggravated robbery. In order to avoid the possibility of the death penalty, Mr. Bond made an agreement with the State that he would be sentenced to life without the possibility of parole if the jury convicted him of aggravated murder.

¶ 10 Prior to Mr. Bond's trial, Mr. Rettig pled guilty to aggravated murder and aggravated kidnapping. He also agreed to testify against Mr. Bond in exchange for a favorable sentencing recommendation. However, when called to the stand in Mr. Bond's trial, Mr. Rettig refused to answer certain questions, citing a fear of federal firearms prosecution. The State granted Mr. Rettig immunity to testify, and the court permitted the prosecution to ask Mr. Rettig leading questions in front of the jury regarding the crimes. Mr. Rettig answered some questions but then repeatedly invoked his Fifth Amendment privilege against self-incrimination and refused to testify. Mr. Bond declined to cross-examine Mr. Rettig, insisting that questioning Mr. Rettig was not permissible given the invocation of privilege. Mr. Bond later moved for a mistrial based on the State's calling Mr. Rettig and forcing him to invoke the privilege before the jury. The trial court denied the motion.

¶ 11 The jury convicted Mr. Bond on all counts. He was sentenced to life without the possibility of parole for aggravated murder, and he received substantial sentences for the aggravated kidnapping, burglary, and robbery charges. Mr. Bond timely appealed. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

**STANDARDS OF REVIEW**

¶ 12 Mr. Bond's three challenges to his convictions implicate different standards of review.

¶ 13   First, Mr. Bond challenges the trial court's denial of his motion for mistrial based on prosecutorial misconduct. We review the trial court's denial of Mr. Bond's motion for a mistrial for an abuse of discretion. *See State v. Harris*, 2004 UT 103, ¶ 21, 104 P.3d 1250; *cf. State v. Bisner*, 2001 UT 99, ¶ 31, 37 P.3d 1073 (applying an abuse of discretion standard to evaluate a motion for a new trial based on prosecutorial misconduct).

¶ 14   Second, Mr. Bond claims a violation of his rights under the Confrontation Clause of the United States Constitution. Mr. Bond acknowledges this claim is unpreserved and thus raises it under the ineffective assistance of counsel and plain error doctrines. For ineffective assistance of counsel, Mr. Bond must satisfy the two-part *Strickland* test, showing "first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant." *Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232.

¶ 15   For plain error, Mr. Bond must demonstrate "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). Mr. Bond and the State dispute how to apply the prejudice part of the plain error doctrine in his case. Mr. Bond contends that when prosecutorial misconduct amounts to a constitutional violation, the prejudice burden shifts to the State to demonstrate that any error was harmless beyond a reasonable doubt, even where a claim is unpreserved. The State argues that the burden does not shift for unpreserved challenges. We hold that for an unpreserved federal constitutional claim, the defendant bears the burden to demonstrate that any error was harmful. *See infra* ¶¶ 36–46.

¶ 16   Third, Mr. Bond alleges that counsel rendered ineffective assistance for failing to move to merge his conviction for aggravated kidnapping with his conviction for aggravated murder. We review this claim under the Supreme Court's *Strickland* test, which has been described above. *Supra* ¶ 14.

## ANALYSIS

¶ 17   We address each of Mr. Bond's arguments in turn. We first consider his claim of prosecutorial misconduct. We then turn

to his argument under the Confrontation Clause. Finally, we address his claim based on the merger doctrine. We conclude that each of Mr. Bond's arguments fails, and we accordingly affirm his convictions.

## I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING MR. BOND'S MOTION FOR MISTRIAL

¶ 18 Prior to Mr. Bond's trial, Mr. Rettig pled guilty to aggravated kidnapping and aggravated murder for his participation in the crime. During trial, the prosecutor called Mr. Rettig as a witness against Mr. Bond. On the first day of questioning, Mr. Rettig answered some questions, admitting he had planned to meet up with Mr. Bond on the day of the murder. But when the prosecutor asked what happened after Mr. Rettig and Mr. Bond met, Mr. Rettig refused to answer the question or to testify further. Outside the presence of the jury, the trial court advised Mr. Rettig that he had already waived his right against self-incrimination and was under subpoena to testify. The court ordered Mr. Rettig to testify. He refused and was dismissed as a witness.

¶ 19 The next day, the prosecutor requested that Mr. Rettig be called again and indicated that the State would grant him use immunity. Defense counsel, as well as Mr. Rettig's own attorney, appear to have fairly protested, arguing that use immunity would not protect Mr. Rettig from possible federal prosecution. Mr. Rettig's attorney apparently informed the trial court that Mr. Rettig intended to invoke his Fifth Amendment privilege against self-incrimination despite the promise of immunity. The court granted the prosecutor's request to call Mr. Rettig, but proceeded with initial questioning outside the presence of the jury. On the stand, Mr. Rettig answered the State's initial questions. Because Mr. Rettig was consistently answering, the court brought the jury back into the courtroom and allowed questioning to continue in its presence.

¶ 20 The trial court also granted the prosecution leave to treat Mr. Rettig as a hostile witness and pose leading questions. Mr. Rettig responded to a number of the prosecutor's initial leading questions. But when the prosecutor asked more detailed

questions about the crimes, Mr. Rettig again refused to answer and cited his Fifth Amendment privilege.[3]

¶ 21 Shortly afterwards, and outside of the jury's and Mr. Rettig's presence, Mr. Bond moved for mistrial based on Mr. Rettig's invocation of his Fifth Amendment privilege before the jury. He alleged that the prosecutor had improperly placed Mr. Rettig on the stand "for the purpose of impressing upon the jury the fact that the privilege [was] being claimed." The trial court denied the motion, ruling that the immunity agreement was "a change in the playing field . . . that justified re-inquiring with Mr. Rettig as to his status and his willingness to testify." The prosecutor also offered to strike the leading questions, but the court declined to strike them, reasoning that the questions themselves were not actually evidence. Instead, on agreement of the parties, the court offered a curative instruction to the jury prohibiting it from considering the claim of privilege.

¶ 22  On appeal, Mr. Bond challenges the trial court's denial of his motion for mistrial based on prosecutorial misconduct. He argues that it was improper for the prosecutor to call Mr. Rettig knowing that he would invoke his Fifth Amendment privilege, and that the court therefore erred in denying his motion for mistrial.[4]

---

[3] The questions that Mr. Rettig refused to answer are the subject of Mr. Bond's Confrontation Clause challenge, and we discuss the substance of the questions in greater detail in our analysis of that claim. *See infra* Part II.

[4] In arguing that the prosecutor's misconduct in calling Mr. Rettig led to a Confrontation Clause violation, Mr. Bond conflates his Fifth Amendment invocation and Confrontation Clause claims. But these are two wholly distinct allegations—one is a claim of improper presentation to the jury of a witness' invocation of a privilege, and the other is a claim of violation of the right to confront the witness. Moreover, as Mr. Bond's appellate counsel candidly acknowledges, only the invocation claim—not the Confrontation Clause allegation—was preserved. Mr. Bond did not argue, and the trial court did not consider, any Sixth Amendment concerns arising from the prosecutor's leading questions. Because the claims are based on different allegations, and because we review preserved and unpreserved claims under

(cont.)

7

¶ 23 As we noted above, "[o]n appeal from a denial of a motion for mistrial based on prosecutorial misconduct, because the trial court is in the best position to determine an alleged error's impact on the proceeedings, we will not reverse the trial court's ruling absent an abuse of discretion." *State v. Hay*, 859 P.2d 1, 6 (Utah 1993). With this standard in mind, we first ask whether the prosecutor's actions constituted misconduct. *Id. at* 6–7.[5] If there was misconduct, we then proceed to ask whether the misconduct influenced the verdict. *Id.* at 7–8.[6] Here, we conclude that the trial court correctly found that the prosecutor did not commit misconduct by calling Mr. Rettig and therefore did not abuse its discretion in denying the motion for mistrial.

¶ 24 A prosecutor may commit misconduct by "call[ing] to the attention of the jurors matters they would not be justified in

different standards, we analyze Mr. Bond's Confrontation Clause argument separately. *See State v. Johnson*, 774 P.2d 1141, 1144–45 (Utah 1989) (indicating that claims must be based on distinct and specific objections in order to be preserved).

[5] This analysis presupposes the existence of a timely and appropriate objection to the alleged misconduct and, therefore, that the issue was preserved for appeal. Here, the State makes no suggestion that Mr. Bond failed to adequately preserve his Fifth Amendment challenge. Consequently, nothing in this opinion should be interpreted as suggesting the existence of, or endorsing, "a standalone basis for direct review of the actions of prosecutors." *State v. Larrabee*, 2013 UT 70, ¶ 65, 321 P.3d 1136 (Lee, J., dissenting).

[6] When evaluating the denial of a mistrial motion based on alleged prosecutorial misconduct, we treat both of these inquiries under the heading of a single abuse of discretion standard. *See State v. Hay*, 859 P.2d 1, 6–8 (Utah 1993). Nonetheless, we recognize that the trial court makes two distinct determinations when presented with an allegation of prosecutorial misconduct— first evaluating whether there was misconduct and then considering any resulting prejudice. *State v. Speer*, 750 P.2d 186, 190 (Utah 1988). It is this second part of the analysis that requires the court's exercise of sound discretion. *Id.* Our review of the trial court's ruling therefore follows this same bifurcated analysis that trial courts do and should employ.

considering in determining their verdict." *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987). Jurors are not to consider a valid invocation of a Fifth Amendment privilege in determining their verdict because "the exercise of the privilege is not evidence to be used . . . by any party." *State v. Travis*, 541 P.2d 797, 799 (Utah 1975). Thus, a prosecutor who calls a witness to testify in a "planned or deliberate attempt[]. . . to make capital out of [the] witness['] refusals to testify" commits misconduct. *Namet v. United States*, 373 U.S. 179, 189 (1963).

¶ 25 Nevertheless, a prosecutor does not invariably commit misconduct by calling a witness who has declared an intention to remain silent. Though a prosecutor may not call a witness simply to "impress[] upon the jury . . . the claim of privilege," there are legitimate reasons to call a witness who has indicated she will invoke the privilege to remain silent. *State v. White*, 671 P.2d 191, 193 (Utah 1983) (emphasis omitted). For example, a prosecutor "may be required" to call such a witness in order "to demonstrate [the witness'] unavailability." *Id.*; *see also State v. Schreuder*, 712 P.2d 264, 274 (Utah 1985) (explaining that it was not misconduct when an attorney "merely called [a witness] to testify under oath before the trial judge about her intentions regarding the privilege"). Further, a witness who refuses to testify to one matter may willingly testify to other matters. *Namet*, 373 U.S. at 188; *see also United States v. Coppola*, 479 F.2d 1153, 1160 (10th Cir. 1973) (acknowledging that the State may "call a witness so as to give that witness an opportunity to answer particular questions"). Finally, a witness who declares an intention to remain silent may not be able to validly claim such a privilege. *See Roberts v. United States*, 445 U.S. 552, 560 n.7 (1980) ("A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give."). Thus, a "prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous," *Namet*, 373 U.S. at 188, but may call a witness if the prosecutor "reasonably assume[s] that the possibility of being cited for contempt by the Court would force [the witness] to testify," *United States v. Harper*, 579 F.2d 1235, 1240 (10th Cir. 1978). In sum, a prosecutor does not commit misconduct if he has at least "a colorable—albeit ultimately invalid—argument" that he is calling the witness for a proper purpose and not "seeking to get evidentiary value from the questions and the claims of privilege." *United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999) (internal quotation marks omitted).

¶ 26 Here, the prosecutor had far more than a colorable argument that Mr. Rettig could not validly claim the privilege against self-incrimination because the prosecution granted him use immunity. The Fifth Amendment privilege applies in both state and federal prosecutions, and therefore a grant of immunity that provides protection in only one jurisdiction but not the other would often be wholly unsatisfactory to the witness. *United States v. Balsys*, 524 U.S. 666, 682 (1998) (calling it "intolerable to allow a prosecutor in one or the other jurisdiction to eliminate the privilege by offering immunity less complete than the privilege's dual jurisdictional reach"). Therefore, if a State compels an individual to testify through a grant of immunity, the federal government is prohibited from then using that testimony or its fruits against the witness in a federal prosecution. *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 79 (1964), *abrogated by Balsys*, 524 U.S. at 683–84; *see also Balsys*, 524 U.S. at 682 ("The only condition on the government when it decides to offer immunity in place of the privilege to stay silent is the requirement to provide an immunity as broad as the privilege itself.").[7]

---

[7] If, however, immunity is granted through voluntary cooperation between the State and the witness—rather than as a means for the State to compel testimony—the immunity is governed by contract law and extends only as far as the grant provides. *See United States v. Brown*, 400 F.3d 1242, 1255–56 (10th Cir. 2005) (holding that statements made by a witness who received immunity from a state prosecutor for his cooperation could be used against him in a federal prosecution because the immunity agreement explicitly denied federal protection); *United States v. Thompson*, 25 F.3d 1558, 1562 (11th Cir. 1994) (applying "basic contract principles" to a grant of informal immunity). Though Mr. Rettig's immunity grant is not in the record, it seems clear to the court that, particularly given Mr. Rettig's refusals, the grant was a means to compel Mr. Rettig to testify and not the result of cooperation with the State. *Cf.* UTAH CODE § 77-22b-1(1)(a) (Utah immunity statute providing that "[a] witness who refuses, or is likely to refuse, on the basis of the witness's privilege against self-incrimination to testify . . . may be compelled to testify . . . after being granted use immunity").

¶ 27 Thus, the immunity granted to Mr. Rettig by the State applied to both state and federal prosecutions, and the prosecutor's argument that Mr. Rettig could not validly claim the privilege was therefore not only colorable, but very likely correct. As the trial court acknowledged, the grant of immunity constituted a "change in the playing field . . . that justified re-inquiring with Mr. Rettig as to his status and his willingness to testify." Therefore, notwithstanding Mr. Rettig's stated intention to invoke his Fifth Amendment privilege, the prosecutor had a sufficient legal basis for calling him to testify.

¶ 28 Furthermore, we find no indication that the prosecutor called Mr. Rettig simply to "impress[] upon the jury . . . the claim of privilege." *White*, 671 P.2d at 193. In fact, the prosecutor appeared to make significant efforts to avoid Mr. Rettig's invocation of his Fifth Amendment privilege. For example, during a sidebar after Mr. Rettig initially refused to testify, the prosecutor was the first to suggest that Mr. Rettig's "Fifth Amendment rights are not something that's relevant for the jury to consider." And before calling Mr. Rettig to the stand for a second time, the prosecutor granted him use immunity. The most obvious purpose for such a grant would be to elicit actual testimony from Mr. Rettig. Moreover, after Mr. Rettig cited possible federal prosecution for gun possession as his basis for remaining silent, the prosecutor offered to limit further questions, saying, "Would you prefer I not talk about questions with regards to [the stolen] guns?" Lastly, the prosecutor offered to strike the leading questions that Mr. Rettig refused to answer and ultimately agreed to a limiting instruction prohibiting the jury from considering the invocation of privilege.

¶ 29 In sum, we find no indication that the prosecutor's calling of Mr. Rettig was a "planned or deliberate attempt[] . . . to make capital out of [his] refusals to testify." *Namet*, 373 U.S. at 189. Thus, Mr. Bond has not established misconduct on the part of the prosecutor for calling Mr. Rettig to testify. Moreover, Mr. Bond has failed to argue—let alone prove—that he was prejudiced by Mr. Rettig's invocation of the privilege.[8] We therefore conclude

---

[8] In any event, the State makes persuasive arguments that there was no prejudice. First, Mr. Rettig's invocation of privilege was an isolated incident in the context of a long trial, and the

(cont.)

that the trial court did not abuse its discretion in denying his motion for mistrial.

## II. MR. BOND HAS NOT ESTABLISHED A CONFRONTATION CLAUSE VIOLATION UNDER EITHER A PLAIN ERROR OR AN INEFFECTIVE ASSISTANCE OF COUNSEL ANALYSIS

¶ 30  Mr. Bond next argues that the prosecution's questioning of Mr. Rettig amounted to a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution because Mr. Bond was denied the right to effectively cross-examine statements made against him.[9] However, Mr. Bond did not preserve this argument in the trial court. Therefore, our disposition turns on whether the trial court plainly erred in allowing the prosecution to question Mr. Rettig in this manner or whether Mr. Bond's lawyers rendered ineffective assistance in failing to move for a mistrial based on the Confrontation Clause. After first setting forth Mr. Bond's argument in greater detail, we explain below why his Confrontation Clause argument fails.

¶ 31  At trial, Mr. Bond raised a compulsion defense, arguing that he and Mr. Rettig had agreed to the scheme to steal the guns but that during the robbery Mr. Rettig changed course and forced Mr. Bond at gunpoint to kill Mr. Mortensen with the knife. As discussed above, the prosecutor called Mr. Rettig to testify as a

---

prosecutor did not rely on or refer to the incident again. Thus, the court's curative instruction to the jury was likely sufficient to mitigate any damage potentially done. *See State v. Harmon*, 956 P.2d 262, 271–74 (Utah 1998) (holding that a curative instruction was sufficient when the alleged error was an isolated incident and the prosecutor did not refer to it again). Second, the State presented extensive circumstantial evidence that both incriminated Mr. Bond and undermined his compulsion defense. In short, we are not persuaded that this brief episode so influenced the jury that a mistrial would be warranted. *See State v. Cardall*, 1999 UT 51, ¶ 18, 982 P.2d 79 ("If the court concludes that the jury was probably not prejudiced by an incident, [the] motion for a mistrial should be denied.").

[9] Mr. Bond raises his confrontation argument under only the federal constitution. Accordingly, we do not address his claim under article 1, section 12 of the Utah Constitution.

witness against Mr. Bond. Because of Mr. Rettig's hesitancy in answering questions, the trial court granted the prosecutor leave to treat Mr. Rettig as a hostile witness and to pose leading questions. Mr. Rettig responded to the first twelve leading questions, admitting that he had agreed to testify against Mr. Bond, that he spoke by phone with Mr. Bond several times on the day of the murder, and that he met up with Mr. Bond later that same day. The prosecutor then asked seven additional leading questions about the details of the robbery and murder of Mr. Mortensen. Mr. Rettig refused to answer those questions, invoking his Fifth Amendment privilege. Mr. Bond contends that the upshot of this chain of events was that the prosecutor effectively testified on behalf of Mr. Rettig, leaving Mr. Bond with no means to challenge the assertions made in the leading questions. Moreover, he argues that the seven additional leading questions were designed to attack his theory of compulsion and that the State presented no other evidence to rebut his defense. He therefore claims a violation of his right under the Confrontation Clause.

¶ 32   The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This constitutional protection ensures a criminal defendant

> a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242–43 (1895).

¶ 33   A prosecutor may impermissibly infringe on this right if she asks leading questions of a witness who claims a privilege against self-incrimination or otherwise refuses to answer. In *Douglas v. Alabama*, the Supreme Court held that the defendant's right to confrontation was violated when the prosecutor used leading questions to read the confession of a codefendant who claimed a Fifth Amendment privilege. 380 U.S. 415, 416–17, 419–20 (1965). There, the Court reasoned that even though the

prosecutor's questions were not technically evidence, the questions "may well have been the equivalent in the jury's mind of testimony" and "the jury might improperly infer both that the statement had been made and that it was true." *Id.* at 419. The Court reversed the conviction, holding that the defendant had no means to challenge the truthfulness of the statement. *Id.* at 418–20; *see also State v. Villarreal*, 889 P.2d 419 (Utah 1995) (finding a Confrontation Clause violation when a codefendant refused to testify and the prosecutor asked leading questions based on the codefendant's earlier confession).

¶ 34 Mr. Bond acknowledges that his counsel did not object to the prosecutor's conduct or move for mistrial on Confrontation Clause grounds. Therefore, he argues in the alternative that the trial court plainly erred in permitting the violation and that his counsel were ineffective for failing to move for mistrial on this basis.

### A. Mr. Bond Has Not Demonstrated that the Trial Court Committed Plain Error

¶ 35 Mr. Bond argues that the trial court committed plain error by permitting the prosecutor to ask leading questions designed to inculpate him, thereby violating his rights under the Confrontation Clause. Mr. Bond and the State dispute the standard applicable to his unpreserved Confrontation Clause claim. Mr. Bond contends that where there is a constitutional violation, the burden to prove harm under plain error shifts to the State to demonstrate that the error was harmless beyond a reasonable doubt. The State acknowledges that it carries such a burden for preserved Sixth Amendment claims, but it argues that when the claim is unpreserved, the burden to prove prejudice remains with the defendant. We agree with the State and hold that the defendant retains the burden to show harm for unpreserved federal constitutional claims under plain error. Applying this standard, we conclude that Mr. Bond is unable to meet his burden to demonstrate that he suffered prejudice.

1. The Standard of Review for Mr. Bond's Unpreserved Confrontation Clause Claim Under the Plain Error Doctrine

¶ 36 The plain error doctrine serves as an exception to our long-standing rule that issues cannot be raised on appeal if they were not argued below at trial. *Monson v. Carver*, 928 P.2d 1017, 1022 (Utah 1996). The exception "enables the appellate court to

balance the need for procedural regularity with the demands of fairness." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (internal quotation marks omitted). But it imposes a high burden on defendants: they must demonstrate that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993).

¶ 37 Mr. Bond cites the Supreme Court's decision in *Chapman v. California*, 386 U.S. 18 (1967), to argue that the burden to demonstrate harm—the third part of the plain error test—shifts from the defendant to the State when a constitutional error is alleged. In *Chapman*, the Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24. And the Court reaffirmed this principle in *Delaware v. Van Arsdall* with language this court has often employed: "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." 475 U.S. 673, 681 (1986).

¶ 38 Neither *Chapman* nor *Van Arsdall* specified whether this federal standard applies with equal force to preserved and unpreserved trial errors, and we acknowledge that our precedent on this issue has not been consistent.[10] In the years immediately following the *Chapman* decision, we cited or applied the harmless beyond a reasonable doubt standard with little discussion. *See, e.g., State v. Martinez*, 457 P.2d 613, 614 (Utah 1969) (first instance of this court applying *Chapman*, concluding that alleged *Miranda* and Fourth Amendment violations were harmless beyond a

---

[10] In recent decisions, our court of appeals has pointed out a tension in our previous cases. *State v. Wright*, 2013 UT App 142, ¶ 41 n.6, 304 P.3d 887 (noting that the question of "[w]hether the defendant or the State bears the burden of showing harm . . . [is] not readily resolvable under our current precedent"); *State v. Cox*, 2012 UT App 234, ¶ 15 n.2, 286 P.3d 15 (Voros, J., concurring) (stating that "Utah case law is not entirely clear" on the issue of "who bears the burden of proof, when a claim of constitutional error is raised within the plain error context").

reasonable doubt); *State v. McGee*, 473 P.2d 388, 391 (Utah 1970) (applying the standard without citing to authority). And in subsequent decisions, we have applied the standard in an inconsistent manner. For example, in *State v. Tillman*, we applied the heightened review standard to an unpreserved challenge to the prosecutor's comments about the defendant's decision not to testify. 750 P.2d 546, 553 (Utah 1987).[11] We quoted the "harmless beyond a reasonable doubt" language from *Van Arsdall* and ultimately did "not hesitate in holding any error was harmless beyond a reasonable doubt" because there was significant evidence of guilt. *Id.* at 555. In *State v. Ross*, we again addressed a constitutional challenge under the doctrine of plain error. 2007 UT 89, 174 P.3d 628. There, the prosecution misstated evidence during closing argument without objection from the defendant. *Id.* ¶¶ 56–57. As to the harm, we asserted that "[i]f prosecutorial misconduct is established, the State must show that the error was harmless beyond a reasonable doubt." *Id.* ¶ 54. We ultimately determined that the prosecutor's comments were "harmless given the weight of evidence against" the defendant and affirmed the conviction. *Id.* ¶¶ 57–58.

¶ 39   In contrast to *Tillman* and *Ross*, in *State v. Medina-Juarez*, we applied a plain error analysis to the defendant's unpreserved claim that the court erroneously admitted statements that had been taken in violation of his Fifth Amendment rights. 2001 UT 79, ¶¶ 17–18, 34 P.3d 187. We held that the defendant failed to

---

[11] Because *State v. Tillman* was a capital case, which may garner unique review under our case law, its precedential value in this non-death penalty setting is somewhat questionable. We do, however, recognize an inconsistency within *Tillman*. We began our analysis in *Tillman* by noting: "This Court will review errors raised and briefed on appeal in death penalty cases, even though no proper objection was made at trial, but will reverse a conviction based upon such errors only if they meet the manifest and prejudicial error standard." 750 P.2d 546, 553 (Utah 1987). Despite this statement, we then employed the "harmless beyond a reasonable doubt" standard in our analysis. *Id.* at 555. But we need not resolve this discrepancy here, and we do not decide whether today's abrogation of the "harmless beyond a reasonable doubt" standard in some of our earlier cases, *see infra* ¶¶ 38–46, extends to our death penalty jurisprudence as well.

establish prejudice because he had not proven that the admitted statements were sufficiently harmful. *Id.* ¶ 18. And in *State v. Cruz,* we recognized that federal courts apply plain error review to unpreserved constitutional claims, requiring the defendant to show prejudice. 2005 UT 45, ¶ 18, 122 P.3d 543.

¶ 40 Furthermore, in *State v. Maestas*, we applied different standards for unpreserved Fifth and Sixth Amendment claims. 2012 UT 46, 299 P.3d 892. There, the defendant brought a multitude of constitutional challenges. He first claimed a violation of his Sixth Amendment right to counsel, arguing that the error should warrant per se reversal under the structural error doctrine[12] because counsel was denied at critical stages of the proceeding. *Id.* ¶ 57. The court began by quoting the "harmless beyond a reasonable doubt" language from *Van Arsdall*, *id.* ¶ 56, but then stated that the defendant's claims were unpreserved and thus could be reviewed only for plain error, *id.* ¶¶ 59, 65, 67. The court then went on to determine that none of the claims warranted per se reversal as structural error and that the defendant therefore bore the burden to demonstrate harm. *Id.* ¶¶ 64, 66, 71. The defendant in *Maestas* next raised an unpreserved Fifth Amendment claim, arguing that the prosecutor impermissibly commented on the defendant's decision not to testify. *Id.* ¶ 161. We quoted the standard from *Tillman*, *id.* ¶ 162, and, without stating which party bore the burden, analyzed the harm under the stricter "harmless beyond a reasonable doubt standard,"*id.* ¶ 165.

¶ 41 The confusion in *Maestas* and our previous cases is perhaps unsurprising given that this court appears to have never

---

[12] A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Only a very limited number of errors qualify as structural. *See Johnson v. United States*, 520 U.S. 461, 468–69 (1997) (listing errors found to be structural). Because these errors are so serious, they generally "defy analysis by 'harmless-error' standards," *Fulminante*, 499 U.S. at 309; but, as we explain below, even structural errors are subject to preservation requirements, meaning that a defendant must establish plain error if he does not preserve the error at trial. *Infra* ¶¶ 42–46.

directly settled a dispute over the proper review standard for an unpreserved federal constitutional claim.[13] But we now take the opportunity to clarify the appropriate standard for such claims. We therefore turn to recent pronouncements by the United States Supreme Court and federal circuit courts, and we disavow any of our precedent that is inconsistent with those articulations.[14]

¶ 42   In *Johnson v. United States*, the Supreme Court held that when a defendant raises an unpreserved constitutional claim—even one serious enough to constitute structural error—the claim is subject to plain error review under which the defendant bears the burden to show harm. 520 U.S. 461 (1997); *see also United States v. Olano*, 507 U.S. 725, 734 (1993) (explaining that under plain error, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice"). In *Johnson*, though she did not object at trial, the defendant claimed on appeal that the trial court violated her Fifth and Sixth Amendment rights by itself deciding an element of the charged crime rather than submitting the element to the jury. 520 U.S. at 464. The Supreme

---

[13] In *State v. Maestas*, for example, the issue before the court was primarily whether the alleged errors were structural in nature (and therefore per se reversible), and not what standard should apply if the errors were not structural. 2012 UT 46, ¶¶ 64, 66, 71, 299 P.3d 892.

[14] We reiterate that our discussion here relates to claims brought under the federal constitution. As to other claims, we have already announced that our "preservation rule applies to every claim, including constitutional questions, unless a defendant can demonstrate that 'exceptional circumstances' exist or 'plain error' occurred." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (citation omitted); *see also State v. Houston*, 2015 UT 40, ¶¶ 18, 20, 353 P.3d 55 (recognizing that Utah Rule of Criminal Procedure 22(e) "operates as another limited exception to the preservation doctrine," permitting facial constitutional challenges to a defendant's sentence in order to "correct an illegal sentence . . . or a sentence imposed in an illegal manner"(internal quotation marks omitted)). And for unpreserved state constitutional questions, the burden to prove plain error does not change: a defendant must demonstrate that an obvious and prejudicial error occurred. *See State v. Menzies*, 889 P.2d 393, 405 (Utah 1994).

Court first affirmed the basic precept that a criminal defendant may forfeit a right afforded her by failing to object at trial. *Id.* at 465; *see also Olano*, 507 U.S. at 731 ("[A] constitutional right . . . may be forfeited in criminal . . . cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (internal quotation marks omitted)). The Court then recognized that rule 52(b) of the Federal Rules of Criminal Procedure provides an exception to this forfeiture principle, permitting courts to correct a plain error even if it was never raised before the trial court. *Johnson*, 520 U.S. at 466. However, plain error review under rule 52(b) requires the defendant to meet a stringent four-part test.[15] It places a burden on the defendant to show that the error "affect[ed] substantial rights," FED. R. CRIM. P. 52(b), meaning that "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734.

¶ 43 The defendant in *Johnson* argued that she should be relieved of the burden to prove plain error under rule 52(b) because the alleged error was structural and thus warranted automatic reversal. *Johnson*, 520 U.S. at 466–67. But the Supreme Court rejected the defendant's argument that unpreserved allegations of structural error should not be reviewed for plain error. *Id.* Instead, the Court declared that "the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." *Id.* at 466. Therefore, the Court did not review the unpreserved claim as a per se reversible structural error or under the heightened *Chapman* standard; rather, it conducted a harmlessness analysis under its rule 52(b) plain error doctrine. *Id.* at 466–70. Under *Johnson*, therefore, even federal constitutional errors so serious as to be deemed structural are subject to preservation requirements. *See*

---

[15] Federal plain error review is similar to Utah's plain error review, although the language differs and the federal test involves an extra step. Under federal analysis, a court has the discretion to correct an error if there is an "(1) error, (2) that is plain, and (3) that affect[s] substantial rights[,] . . . [and] (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467 (first and fifth alterations in original) (internal quotation marks omitted).

*Neder v. United States*, 527 U.S. 1, 9 (1999) (recognizing that in *Johnson*, "[t]he defendant failed to object at trial, and we thus reviewed her claim for 'plain error'").

¶ 44 Similarly, in *Kimmelman v. Morrison*, the Supreme Court explained that if a defendant fails to preserve a Fourth Amendment objection at trial, "he also loses the opportunity to obtain direct review under the harmless-error standard of *Chapman v. California*." 477 U.S. 365, 382 n.7 (1986). And the Tenth Circuit reached the same determination we do here: for an unpreserved constitutional error, "our review should be for plain error under [Federal Rule of Criminal Procedure] 52(b), as opposed to the 'harmless beyond a reasonable doubt' standard under *Chapman* . . . for preserved constitutional error." *United States v. Lott*, 310 F.3d 1231, 1240 (10th Cir. 2002).[16] Based upon these federal pronouncements, we hold that unpreserved federal constitutional claims are not subject to a heightened review standard but are to be reviewed under our plain error doctrine.[17]

¶ 45 This holding comports with the aims of preservation as expressed by the United States Supreme Court and this court. The Supreme Court has explained that under plain error review, the

---

[16] A number of our sister states that have considered the issue have likewise interpreted federal precedent to require the heightened standard only for preserved constitutional claims. *E.g.*, *Martinorellan v. State*, 343 P.3d 590, 593 (Nev. 2015); *Savoy v. State*, 22 A.3d 845, 851–52, 852 n.4 (Md. 2011); *People v. Miller*, 113 P.3d 743, 749 (Colo. 2005).

[17] In *Chapman v. California*, the Supreme Court held that its "harmless beyond a reasonable doubt" standard should govern review of federal constitutional errors, even in state courts. 386 U.S. 18, 20–21 (1967). But where the "harmless beyond a reasonable doubt" standard is not applicable, *Chapman* is silent as to whether we are free to apply our own state plain error test or are bound to follow the federal plain error test. However, we need not decide that issue here for two reasons. First, both parties exclusively relied upon and advocated under our Utah plain error standard in their briefs. Second, the outcome here would be the same under either test: both tests in these circumstances require Mr. Bond to show prejudice, and he has failed to do so. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993); *Johnson*, 520 U.S. at 467.

"burden should not be too easy for defendants" and the standard of review should "encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). Similarly, our Utah rules of preservation promote judicial economy by allowing a court to rule on the issues and correct errors, thus avoiding appeals and retrials. *Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828. And because in our adversarial system the responsibility to detect errors lies with the parties and not the court, preservation rules encourage litigants to grant the district court the first opportunity to rule on an issue. *Id.* ¶ 16.

¶ 46 Moreover, requiring a defendant to demonstrate prejudice on an unpreserved claim harmonizes the prejudice inquiries under the plain error and ineffective assistance of counsel doctrines. Both doctrines serve as exceptions to our preservation rules, permitting a court to review errors that would otherwise be forfeited. *See id.* ¶ 13. For ineffective assistance of counsel claims, which are themselves constitutional concerns grounded in the Sixth Amendment, the Supreme Court has placed on the defendant the burden of showing prejudice. *See Strickland v. Washington*, 466 U.S. 668, 684–87 (1984).[18] And ineffective assistance claims are almost never raised in the trial itself but are usually made for the first time by appellate counsel. It would make little sense to require a defendant to prove prejudice under the circumstances of ineffective assistance and yet relieve him of that duty for other constitutional errors that could more easily have been raised during the trial. This court cannot conceive of a reason for these standards to diverge, and Mr. Bond has made no attempt to provide us with one.

¶ 47 Having determined the appropriate plain error test for unpreserved federal constitutional claims, we now apply that standard to Mr. Bond's Confrontation Clause argument.

---

[18] The Court has held that prejudice is presumed for certain Sixth Amendment violations. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984). But this class of error is extremely limited, including, for example, an actual or constructive denial of the right to counsel or when counsel labors under an actual conflict of interest. *Id.*

2. Mr. Bond Has Failed to Establish that Any Error Was Harmful

¶ 48 To succeed on his Confrontation Clause claim, Mr. Bond must satisfy all three parts of the plain error test: he must demonstrate (1) that there was an error, (2) that it should have been obvious to the trial court, and (3) that it was harmful. *See Dunn*, 850 P.2d at 1208–09. Mr. Bond argues that the trial court committed error in permitting the prosecutor to ask Mr. Rettig leading questions because Mr. Bond had no effective means to cross-examine the assertions made through the questioning. And he contends that the prosecutor's questioning was contrary to settled law and therefore should have been obvious to the trial court. Finally, Mr. Bond argues that the leading questions were harmful because they constituted "the only direct evidence that [Mr.] Bond killed Kay [Mortensen] with the requisite intent rather than under compulsion."

¶ 49 Because Mr. Bond bears the burden on plain error review, if any of the three elements is not satisfied, his claim fails. Here, we turn first to the prejudice element. "An error is harmful if, absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, [if] our confidence in the verdict . . . is undermined." *Maestas*, 2012 UT 46, ¶ 37 (first alteration in original) (internal quotation marks omitted). In reviewing each of the seven questions below, we determine that the questions did little more than duplicate evidence already admitted at trial. Moreover, any aspects of the leading questions that went beyond established evidence ultimately had little bearing on Mr. Bond's defense of compulsion. Mr. Bond therefore has not established prejudice.

a. The First Five Questions

¶ 50 The prosecutor first asked Mr. Rettig five related questions that all focused on the planning and initial stages of the crime:

| | |
|---|---|
| *Question 1* | "Isn't it true that you've told the police that the reason you were meeting up with [Mr.] Bond is because you and him had talked about going to a man's house and taking some guns the day before, November 15, 2009?" |
| *Question 2* | "Isn't it true that you told the police that [Mr. Bond] had actually approached you the day |

before and talked about going to some guy's
house in Payson and stealing some guns?"

*Question 3* "Okay, so the question is, isn't it true that
you told the police that you drove from
Vernal to Payson, that you stopped at
Walmart and bought some zip ties and latex
gloves and some hoodies with Mr. Bond?"

*Question 4* "Isn't it true that you told the police that you
went up to Kay Mortensen's house and [Mr.
Bond] told you to stay in the car while he
went and knocked on the door?"

*Question 5* "Isn't it true that you actually entered the
house at the direction of [Mr. Bond] with the
gun and you helped zip tie Kay Mortensen?
Isn't that true, isn't that true that you told the
police?"

¶ 51  Together, these questions imply that Mr. Bond took the
lead in the early stages of the robbery. They suggest that Mr. Bond
originated the idea of robbing Mr. Mortensen, directed Mr. Rettig
to remain in the car when they arrived, knocked on the door, and
prompted Mr. Rettig to enter the home. But many of these factual
assertions were established by other evidence already presented
to the jury by the State. For example, in a recorded interview with
police, Mr. Bond explained that he and Mr. Rettig had planned to
travel to Mr. Mortensen's home to steal his guns and that they met
up for that purpose on the day of the murder. Mr. Bond's ex-wife
also testified that Mr. Bond told her he drove with Mr. Rettig to
Payson to rob Mr. Mortensen. Additionally, the State had
presented evidence that Mr. Bond brought zip ties and latex
gloves to Mr. Mortensen's home on the night of the murder.
Likewise, the State established through earlier evidence that
Mr. Rettig held the gun as they entered the home and helped to
zip-tie Mr. Mortensen.

¶ 52  More importantly, however, none of the first five
questions directly contradicts or undermines Mr. Bond's
compulsion defense. When the pair entered Mr. Mortensen's
home, Mr. Bond and Mr. Rettig were carrying out a mutually
agreed upon plan to rob him of his guns. According to Mr. Bond's
theory of the case, the plan went awry when Mr. Rettig forced him
to kill Mr. Mortensen at gunpoint. And Mr. Rettig's alleged

compulsion did not occur until well after the pair exited the car and entered the home. Thus, any implication that Mr. Bond took the lead in the early stages of the robbery did not foreclose the possibility that Mr. Rettig changed course and later forced Mr. Bond at gunpoint to kill Mr. Mortensen. In other words, even if Mr. Bond directed the early stages of the robbery, his compulsion defense remained intact. We therefore conclude that these initial questions were unlikely to undermine Mr. Bond's defense or affect the outcome of the trial.

b. The Sixth Question

¶ 53 The prosecutor next asked more directly about the circumstances of the murder and who was responsible for carrying out the act:

*Question 6* "Isn't it true that you repeatedly told the police that [Mr. Bond] is the one who stabbed and killed Kay Mortensen and that you were holding the gun upstairs in the bathroom; isn't that true?"

¶ 54 But this question is not harmful to Mr. Bond's defense because it actually restates Mr. Bond's own version of events. The State had introduced notes that Mr. Bond wrote and passed to another inmate in which he related the exact scenario suggested by the prosecutor's question: he wrote that Mr. Rettig threatened him with the handgun and compelled him to slit Mr. Mortensen's throat. Moreover, defense counsel argued the same version of events in closing as the basis of Mr. Bond's compulsion defense. Far from prejudicing Mr. Bond, this question actually paralleled his theory of the case. Thus, Mr. Bond was not prejudiced by this question.

c. The Seventh Question

¶ 55 Finally, the prosecutor inquired about the proceeds of the robbery—the guns stolen from Mr. Mortensen's house:

*Question 7* "Isn't it true that you didn't get any guns or anything or any, or you didn't get paid, you didn't receive anything, that's what you told the police, [that] you didn't receive anything at all?"

¶ 56 Through Mr. Bond's jail notes and his interview with police, the jury had already learned that Mr. Rettig left all of the

stolen guns with Mr. Bond after the murder. And in ruling on the mistrial motion, the trial court observed that "there was . . . substantial evidence already in the record to establish that Mr. Rettig had not received any sort of financial or other benefit from this event." Therefore, because the jury already heard evidence that Mr. Rettig did not receive the guns, we conclude that this question would have had little impact on the jury.

¶ 57 For each of the seven questions, Mr. Bond has failed to demonstrate prejudice resulting from the prosecutor's assertions that would undermine our confidence in the jury's verdict. Because he has not met his burden to show prejudice, we reject his claim of plain error.

### B. Mr. Bond Has Failed to Establish Ineffective Assistance of Counsel for Counsel's Failure to Move for Mistrial Based on a Confrontation Clause Violation

¶ 58 Mr. Bond argues that his counsel provided ineffective assistance because counsel did not move for a mistrial based on an alleged Confrontation Clause violation. He contends that counsel's performance was deficient because there was "no conceivable legitimate tactic or strategy" for failing to move on this ground. *State v. Tennyson*, 850 P.2d 461, 468 (Utah App. 1993). Moreover, he claims he was prejudiced because the trial court would have been compelled to grant a mistrial based on the alleged Confrontation Clause violation. We determine, however, that no prejudice resulted from counsel's actions, and Mr. Bond's claim accordingly fails.

¶ 59 The Sixth Amendment to the United States Constitution guarantees a criminal defendant the "Assistance of counsel for his defense," meaning that he has "the right to effective assistance of counsel," *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (internal quotation marks omitted). Under the Supreme Court's decision in *Strickland v. Washington*, Mr. Bond must satisfy a two-part test to demonstrate that he has been denied counsel's effective assistance. 466 U.S. 668, 687 (1984). First, Mr. Bond must show that "his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment." *Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 (internal quotation marks omitted). Second, he must show that "counsel's performance prejudiced" him, meaning that there is "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* ¶¶ 38, 40 (internal quotation marks omitted). Here, we first turn to the prejudice element of Mr. Bond's claim and determine that he has failed to establish there is "a reasonable probability" that the "result of the proceeding would have been different." *Id.* ¶ 40.

¶ 60 In much the same way that Mr. Bond failed to show prejudice under plain error, *see supra* ¶¶ 49–57, he has also failed to demonstrate prejudice under the ineffective assistance of counsel test in *Strickland*. Even assuming there was a Confrontation Clause violation, Mr. Bond did not establish that he was prejudiced by the prosecutor's leading questions. Because there was no harm from the questions, he also has not shown "a reasonable probability that . . . the result of the proceeding would have been different," meaning, in this case, that the trial court would have granted the motion for mistrial had counsel moved on that ground. *Archuleta*, 2011 UT 73, ¶ 40. Therefore, we hold that Mr. Bond has not established that defense counsel's failure to move for a mistrial based on his Confrontation Clause right constituted ineffective assistance of counsel.

## III. MR. BOND HAS NOT ESTABLISHED INEFFECTIVE ASSISTANCE FOR COUNSEL'S FAILURE TO MOVE TO MERGE HIS CONVICTIONS

¶ 61 Lastly, Mr. Bond argues that he received ineffective assistance because counsel did not move to merge his charge of aggravated kidnapping with the charge of aggravated murder. We hold that the charges could not merge as a matter of law and therefore such a motion would have been unsuccessful. Accordingly, Mr. Bond cannot demonstrate that his trial lawyers were ineffective for failing to raise a futile motion.

¶ 62 Under the first part of *Strickland*, Mr. Bond must show that "his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment." *Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 (internal quotation marks omitted). In so doing, Mr. Bond must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (internal quotation marks omitted).

¶ 63 "[T]he failure of counsel to make motions . . . [that] would be futile if raised does not constitute ineffective assistance." *Codianna v. Morris*, 660 P.2d 1101, 1109 (Utah 1983) (internal quotation marks omitted). This is because the decision not to pursue a futile motion is almost always a "sound trial strategy." *Litherland*, 2000 UT 76, ¶ 19 (internal quotation marks omitted). And where there is a sound strategy, a defendant cannot satisfy his burden of demonstrating that counsel's "performance fell below an objective standard of reasonable professional judgment." *Archuleta*, 2011 UT 73, ¶ 38 (internal quotation marks omitted). We thus consider whether a motion for merger of Mr. Bond's convictions would have been futile.

¶ 64 Mr. Bond argues that because aggravated kidnapping is a predicate offense of aggravated murder and is established by proof of the same facts, the former is a lesser included offense of the latter and he cannot be convicted of both.[19] He contends that allowing both convictions to stand would violate Utah's merger doctrine—set forth in Utah Code section 76-1-402(3)—and the Double Jeopardy Clause.[20]

¶ 65 The merger doctrine "is a judicially-crafted doctrine available to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Smith*, 2005 UT 57, ¶ 7, 122 P.3d 615 (internal quotation marks omitted). "The motivating principle behind the merger doctrine is to prevent violations of

---

[19] In its brief, the State also discusses the so-called *Finlayson* merger doctrine and argues that it does not apply here. Mr. Bond appears to agree, noting that neither the court of appeals decision in that case, *State v. Finlayson*, 956 P.2d 283, 287 (Utah Ct. App. 1998), nor this court's subsequent decision, *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, "are material to the issue" presented here. Accordingly, we do not address Mr. Bond's claim under the *Finlayson* doctrine. *See Allen v. Friel*, 2008 UT 56, ¶ 16, 194 P.3d 903 (declining to address arguments not raised or briefed by the parties).

[20] Mr. Bond raises his double jeopardy argument under both the Utah and United States Constitutions. But because he "has not separately briefed his state constitutional claim, . . . we do not reach it." *State v. Mace*, 921 P.2d 1372, 1376 (Utah 1996).

constitutional double jeopardy protection." *Id.; see also Brown v. Ohio*, 432 U.S. 161, 169 (1977) (holding that the Double Jeopardy Clause "forbids successive prosecution and cumulative punishment for a greater and lesser included offense"). The doctrine is codified in Utah Code section 76-1-402(3), which provides that a defendant "may not be convicted of both the offense charged and the included offense." An offense is an included offense if "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged." UTAH CODE § 76-1-402(3).

¶ 66 The State charged Mr. Bond with aggravated murder under Utah Code section 76-5-202(1), which elevates homicide to aggravated murder "if the actor intentionally or knowingly causes the death of another" under any of several enumerated circumstances. The jury instruction in Mr. Bond's case presented the jury with the following possible aggravating circumstances:

> (a) The homicide was committed incident to an act, scheme, course of conduct, or criminal episode during which the actor committed or attempted to commit aggravated robbery, robbery, aggravated burglary, aggravated kidnapping, or kidnapping; OR
>
> (b) The homicide was committed for pecuniary gain
>
> . . . .

*See id.* § 76-5-202(1)(d), (g). The jury convicted Mr. Bond of both the aggravated kidnapping and aggravated murder of Mr. Mortensen, but the verdict form did not specify which circumstance the jury deemed satisfied for the aggravated murder charge.

¶ 67 Mr. Bond argues that because aggravated kidnapping is a predicate offense of aggravated murder and was most "closely and causally related" to the homicide, it must merge with the aggravated murder conviction. He cites precedent from this court for the proposition that a predicate offense is a lesser included offense of aggravated murder and thus precludes conviction for both. *See State v. Shaffer*, 725 P.2d 1301, 1313–14 (Utah 1986) (merging an aggravated robbery conviction with a first-degree murder conviction because "[n]o additional facts or separate elements are required to prove aggravated robbery after first degree murder based on the predicate offense of aggravated robbery is shown"); *State v. Wood*, 868 P.2d 70, 88–91 (Utah 1993)

(merging a predicate offense of aggravated sexual assault with a first-degree murder conviction); *State v. Nielsen*, 2014 UT 10, ¶¶ 57–58, 326 P.3d 645 (merging a conviction for aggravated kidnapping with an aggravated murder conviction because aggravated kidnapping is established by proof of the same elements as or fewer elements than aggravated murder).

¶ 68 But the cited cases are ultimately irrelevant to our analysis here. The touchstone of the analysis under Utah Code section 76-1-402(3) and the Double Jeopardy Clause is the intent of the Legislature, *Smith*, 2005 UT 57, ¶ 9, and Mr. Bond errs in failing to acknowledge the difference between the statutes at issue in *Shaffer*, *Wood*, and *Nielsen* and the aggravated murder statute under which he was convicted.

¶ 69 To resolve whether convictions must merge, the "determination to be made is whether the legislature intended" an offense to be a lesser included offense of another. *State v. McCovey*, 803 P.2d 1234, 1238 (Utah 1990); *see also Albernaz v. United States*, 450 U.S. 333, 344 (1981) ("[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended . . . to impose multiple punishments, imposition of such sentences does not violate the Constitution." (Stewart, J., concurring) (first alteration in original) (internal quotation marks omitted)). To determine whether the Legislature intended an offense to be a lesser included offense, we look to the plain language of the statute that defines the criminal offense. *Smith*, 2005 UT 57, ¶ 11.

¶ 70 We have recognized that some statutes operate as "enhancement statutes." *McCovey*, 803 P.2d at 1237. They "are different in nature than other criminal statutes because they single out particular characteristics of criminal conduct as warranting harsher punishment." *Smith*, 2005 UT 57, ¶ 10 (internal quotation marks omitted). And where the Legislature has designated a statute as an enhancing statute, the merger doctrine has no effect. *Id.* ¶ 9. However, the Legislature exempts a statute from the requirements of the merger doctrine only when "an explicit indication of legislative intent is present in the specific offense statute." *Id.* ¶ 11. Applying this requirement in *State v. Ross*, we held that an underlying felony that constitutes the aggravating factor for aggravated murder merges with the aggravated murder conviction. 2007 UT 89, ¶ 64, 174 P.3d 628. This was because

"explicit indication [of intent] is required" and the Legislature "has done nothing to clearly indicate that the provision . . . is intended to enhance the penalty for [murder] when certain characteristics are present." *Id.* (second and third alterations in original) (internal quotation marks omitted). As in *Ross*, the statutes at issue in *Shaffer, Wood*, and *Nielsen* contained no such explicit exemption from the merger doctrine. *See* UTAH CODE § 76-5-202 (1953) (first-degree murder statute in *Shaffer*); *id.* § 76-5-202 (1988) (first-degree murder statute in *Wood*); *id.* § 76-5-202 (2000) (aggravated murder statute in *Nielsen*).

¶ 71 After *Ross*, however, the Legislature did amend the aggravated murder statute to provide an explicit exemption from the merger doctrine. *See* Criminal Penalties Revisions, 2008 Utah Laws 643–45. The amendment added subsection (5), which reads:

> Any aggravating circumstance described in Subsection (1) or (2) that constitutes a separate offense does not merge with the crime of aggravated murder. . . . A person who is convicted of aggravated murder, based on an aggravating circumstance described in Subsection (1) or (2) that constitutes a separate offense, may also be convicted of, and punished for, the separate offense.

UTAH CODE § 76-5-202(5). The plain language of this amended aggravated murder statue—under which Mr. Bond was convicted—can leave no doubt that the Legislature intended that a predicate offense does not merge with the homicide conviction.

¶ 72 Because, as a matter of law, Mr. Bond's convictions for aggravated kidnapping and aggravated murder do not merge, a motion seeking merger would have been futile. Therefore, Mr. Bond has not shown that his counsel performed deficiently, and his claim for ineffective assistance of counsel fails.

## CONCLUSION

¶ 73 We determine that each of Mr. Bond's three claims fails. Mr. Bond has not established that the trial court abused its discretion in denying his motion for mistrial because he has not demonstrated that the prosecutor committed misconduct. Mr. Bond also failed to carry his burden to demonstrate prejudice for his alleged Confrontation Clause violation. Finally, Mr. Bond cannot show that counsel performed deficiently by failing to make

a futile motion to merge his convictions. We therefore affirm his conviction.

————————