*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 53**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner,*

*v.*

FRANKLIN JAMES,
*Respondent.*

No. 20230883
Heard December 11, 2024
Filed November 13, 2025

On Certiorari to the Utah Court of Appeals

Third District Court, Salt Lake County
The Honorable Randall N. Skanchy
No. 201914105

Attorneys:

Derek E. Brown, Att'y Gen., Daniel W. Boyer, Asst. Solic. Gen., Salt Lake City, for petitioner

Erick Grange, Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court, in which JUSTICE PETERSEN and JUSTICE POHLMAN joined.

JUSTICE HAGEN authored a dissenting opinion, in which CHIEF JUSTICE DURRANT joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 As part of a plea bargain, Franklin James pleaded guilty to multiple felony counts. In exchange, the State dropped several charges against James and agreed to recommend probation. The district court rejected that recommendation and sentenced James to prison. Our court of appeals reversed for a new sentencing

proceeding because James was not invited to allocute—that is, to personally address the district court prior to sentencing. Although James did not ask the court for the opportunity to speak, our court of appeals nevertheless concluded that the district court's error merited reversal under our plain error test. To reach this result, the court of appeals borrowed a holding from the United States Court of Appeals for the Tenth Circuit that defendants may shoulder their burden of demonstrating prejudice by showing that the district court failed to offer them the opportunity to allocute. We decline to adopt such a rule. The Tenth Circuit based its holding on data from federal sentencing proceedings. Whatever the implications of that data, they do not carry over to Utah's sentencing regime, which differs in important ways from its federal counterpart. Accordingly, we reverse and remand the case for the court of appeals to consider James's remaining challenge to his sentence—that the district court abused its discretion in sentencing him to prison.

## BACKGROUND

¶2    A police search of Franklin James's apartment turned up illegal drugs, drug paraphernalia, and firearms. The State originally charged James with eleven counts of various drug- and firearm-related offenses. Later, in exchange for a guilty plea on three of those counts, the State agreed to drop the other charges. As part of the same deal, the parties agreed to "jointly recommend that the prison sentences be run concurrent to each other and suspended" in favor of probation. The parties recommended probation over prison in part to enable James to receive treatment for drug addiction. Before his change of plea hearing, James wrote two letters to the district court expressing remorse for his actions.

¶3    At that hearing, the district court expressed skepticism about the parties' recommendation, noting that James was "not the sort of person" the court typically sent to "a therapeutic community without some . . . compelling reason." To aid in its decision, the court requested a presentence investigation report from Adult Probation and Parole (AP&P).

¶4    AP&P's recommendation largely tracked that of the parties. AP&P endorsed supervised release to a residential treatment facility as soon as a bed opened, with prison until that time or until James had served a total of 300 days (including time served while awaiting his sentence).

¶5    Both parties spoke in favor of AP&P's recommendation at sentencing. James's attorney argued that James's "eloquent" letters,

the support of community members, and the approval of the target recovery facility all weighed in favor of accepting the presentence report. The State agreed and called James's addiction recovery "an investment worth taking."

¶6 The district court disagreed. It sentenced James to prison for the indeterminate terms set by statute, with the sentences to run concurrently. The court pointed to James's extensive criminal history to explain its decision. It also noted its belief that treatment for drug addiction would be "accessible and available" to James in prison.

¶7 At no time during the sentencing proceeding did the district court ask James to speak. Nor did James ask to address the court.

¶8 James appealed his sentence. Before the court of appeals, he argued that the district court violated his constitutional and statutory right to allocution when the court failed to ask him to speak before delivering its sentence. James further argued that the district court abused its discretion by ignoring the unanimous recommendation of the State, the defendant, and AP&P.

¶9 The court agreed with James's allocution argument and vacated his sentence. *See State v. James*, 2023 UT App 80, ¶ 1, 536 P.3d 31. Because the allocution argument was unpreserved, the court of appeals reviewed it for plain error. *See id.* ¶¶ 7–8. A defendant must ordinarily show three things to establish plain error: (1) an error occurred; (2) the error should have been obvious to the district court; and (3) the error was prejudicial—that is, there is a reasonable probability that the error affected the outcome of the proceedings. *See id.* ¶¶ 7, 22 n.5.

¶10 The court of appeals held that the district court made an obvious error when it failed to "afford [James] an opportunity to make a statement and to present any information in mitigation of punishment" before imposing sentence. *Id.* ¶ 18 (quoting UTAH R. CRIM. P. 22(a)); *see State v. Wanosik*, 2003 UT 46, ¶ 20, 79 P.3d 937 (recognizing allocution as "an inseparable part of the right to be present" under the state constitution (cleaned up)). This satisfied the first two elements of plain error.

¶11 The court of appeals then held that James had proved the third element by proving the first two. That is, the court of appeals held that defendants "necessarily demonstrate[]" prejudice merely by establishing a violation of their right to allocution, *James*, 2023 UT App 80, ¶ 22 (cleaned up)—unless they already received "the lightest possible sentence" or some other "extraordinary circumstance"

applies, *id.* ¶ 24 (cleaned up). Where James's case did not reflect any extraordinary circumstance, he demonstrated prejudice by showing that the court did not, on its own initiative, invite him to allocute. *See id.* ¶ 27.

¶12 To reach that result, our court of appeals adopted the United States Court of Appeals for the Tenth Circuit's approach, as articulated in *United States v. Bustamante-Conchas*, 850 F.3d 1130 (10th Cir. 2017) (en banc). *James*, 2023 UT App 80, ¶ 22. *Bustamante-Conchas* determined that a reasonable probability exists that allocution matters in "the usual case." 850 F.3d at 1139. Following the lead of a then-recent United States Supreme Court case, *Bustamante-Conchas* permitted defendants to substitute a statistical probability that an error mattered to the outcome of a proceeding for a case-specific showing of prejudice. *See id.* (discussing *Molina-Martinez v. United States*, 578 U.S. 189 (2016)).

¶13 Because the court of appeals resolved the case on James's allocution claim, it did not reach his abuse-of-discretion argument. *See James*, 2023 UT App 80, ¶ 7 n.1.

## ISSUE AND STANDARD OF REVIEW

¶14 We granted certiorari to determine whether "the [c]ourt of [a]ppeals erred when it concluded that [James] had necessarily demonstrated prejudice when he established that the district court had denied his right to allocution." "On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standards of review used by the court of appeals. We conduct that review for correctness, ceding no deference to the court of appeals." *State v. Gallegos*, 2020 UT 19, ¶ 31, 463 P.3d 641 (cleaned up).

## ANALYSIS

¶15 We begin by clarifying the question presented for our review. Our court of appeals left some doubt as to which of two possible tests it meant to adopt from the Tenth Circuit. That ambiguity trickles down to the parties' arguments. We believe the test the Tenth Circuit adopted—and the one for which we granted certiorari review—is that, when a failure to allocute is on the line, the mere existence of the error can suffice to demonstrate prejudice.

¶16 We next address the State's argument that our caselaw prevents us from adopting this test and conclude that it does not. But we need not decide whether to adopt the test in this appeal because, as we next explain, state-level allocution errors do not meet the

preconditions of the Tenth Circuit's test. Because of differences between state and federal sentencing regimes, we are skeptical that a reasonable probability exists that allocution errors change the outcome of the typical Utah sentencing proceeding.

¶17 Finally, we conclude that James has presented no case-specific evidence of prejudice.

I.   THE QUESTION UNDER REVIEW

¶18 The State argues that the court of appeals erred when it adopted the Tenth Circuit Court of Appeals' approach to prejudice related to unpreserved allocution errors. But before we address the merits of that contention, we must clarify what exactly the Tenth Circuit's approach is. The State characterizes it in at least three ways: (1) as "do[ing] away with harmlessness analysis altogether"; (2) as creating a presumption of prejudice; and (3) as establishing that defendants "necessarily demonstrate[] harm" by establishing a denial of the right to allocution.

¶19 Each of these purported glosses on the Tenth Circuit's approach describes a distinct exception to the ordinary standard of plain error prejudice. While federal courts have made use of all three exceptions, only one—the third—maps onto the rule the Tenth Circuit set forth in *United States v. Bustamante-Conchas*, 850 F.3d 1130 (10th Cir. 2017) (en banc). A close reading of *Bustamante-Conchas* illustrates this point. But to properly understand *Bustamante-Conchas*, we must first chart the firmament of federal plain error review in which that decision resides.

*A.  The Federal Plain Error Standard*

¶20 The "starting point" for understanding the federal plain error standard is the United States Supreme Court's decision in *United States v. Olano*, 507 U.S. 725 (1993). *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). *Olano* divided plain error review into "four steps, or prongs." *Puckett v. United States*, 556 U.S. 129, 135 (2009). First, there must have been an error in the district court proceedings, with "error" defined as an un-waived deviation from a legal rule. *See Olano*, 507 U.S. at 732–34. Second, the error must be plain, or "clear under current law." *Id.* at 734; *see also Henderson v. United States*, 568 U.S. 266, 273 (2013) (clarifying that the error need only be plain as of "the time of appellate review"). Third, the error must "affect substantial rights." *Olano*, 507 U.S. at 734 (cleaned up) (citing rule 52(b) of the Federal Rules of Criminal Procedure). "[I]n most cases," this third prong "means that the error must have been

prejudicial." *Id*. Finally, if the first three prongs are present, a court of appeals may exercise its discretion to correct the error. *Id.* at 735–36. It should exercise this discretion only where the error is one that "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (cleaned up); *Puckett*, 556 U.S. at 135.

¶21 We pause to say a few more words about the prejudice requirement, since that is at issue in this appeal. Which party bears the burden of persuasion is "one important difference" separating the standards for preserved and unpreserved error in the federal system. *Olano*, 507 U.S. at 734. When an error is preserved, the government generally bears the burden of persuading an appellate court that the error was harmless. *Molina-Martinez*, 578 U.S. at 202–03. When an error is unpreserved, however, the burden shifts to the defendant to demonstrate "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different."[1] *United States v. Dominguez Benitez*, 542 U.S. 74, 81–82 (2004) (cleaned up).

¶22 The Supreme Court has emphasized that it is—and "should be"—difficult to establish plain error. *Puckett*, 556 U.S. at 135 (cleaned up). This policy flows from the standard's "careful balancing of [the] need to encourage all trial participants to seek a fair and accurate trial the first time around against [the] insistence that obvious injustice be promptly redressed." *Johnson v. United States*, 520 U.S. 461, 466 (1997) (cleaned up). The rigor of the plain error test induces "the timely raising of claims and objections" before the district court. *Puckett*, 556

---

[1] Allocation of the burden of persuasion on the prejudice prong is not the only difference separating the treatment of preserved and unpreserved error under the federal standard. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Another is the "distinction between automatic and discretionary reversal," with preserved error subject to automatic reversal (if not show to be harmless) and unpreserved error subject to appellate court discretion under the fourth prong of *Olano. Id.* at 744 (Stevens, J., dissenting).

In Utah, we have not differentiated between preserved and unpreserved claims as sharply. Except when an error is "of constitutional dimension," the defendant bears the burden of demonstrating harm on appeal, regardless of preservation. *State v. Leech*, 2020 UT App 116, ¶ 43 n.7, 473 P.3d 218; *see also State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712. Utah also lacks a corollary to the discretionary fourth element of the federal test. *State v. Bond*, 2015 UT 88, ¶ 42 n.15, 361 P.3d 104.

U.S. at 134. This is desirable because district courts can address errors in the first instance and can, unlike appellate courts, correct errors before they are able to "affect the ultimate outcome." *See id.* Additionally, the difficulty of demonstrating plain error discourages litigants from "sandbagging the court—remaining silent about [their] objection[s] and belatedly raising the error only if the case does not conclude in [their] favor." *Id.* (cleaned up); *see also id.* at 140 ("Requiring [contemporaneous] objection means the defendant cannot 'game' the system, waiting to see if the sentence later strikes him as satisfactory." (cleaned up)).

¶23 The Supreme Court has "repeatedly cautioned" against the creation of "unjustified exception[s]" to plain error review, *id.* at 135–36, or to any of its component prongs, *see id.* at 141. Indeed, even some "essential" and "highly desirable" features of criminal procedure are not so essential or desirable as to trump the defendant's "usual burden of showing prejudice." *Id.* (cleaned up).

¶24 Nevertheless, federal courts have recognized three exceptions that can justify relieving a defendant from the requirement of making a case-specific showing of prejudice. First, "a special category of forfeited errors . . . can be corrected regardless of their effect on the outcome" because the errors are not amenable to harmless-error review. *Olano*, 507 U.S. at 735. Second, some errors "should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Id.* Third, for some errors, "the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 578 U.S. at 198.

### 1. Structural Errors

¶25 Since *Olano*, the Court has continued to entertain the possibility that some errors can "automatically satisfy the third prong of the plain error test." *See Puckett*, 556 U.S. at 140 (collecting cases). Most often, the Court has linked this exception to the concept of "structural error" articulated in *Arizona v. Fulminante*, 499 U.S. 279 (1991). *See Puckett*, 556 U.S. at 140–41. *Fulminante* divided constitutional errors into trial and structural types. 499 U.S. at 309–10. Structural errors differ from trial errors in that they "defy analysis by 'harmless-error' standards" because they affect "[t]he entire conduct of the trial from beginning to end" or "the framework within which the trial proceeds." *Id.* at 309–10. Put differently, they "transcend[] the criminal process." *Id.* at 311. Errors deemed structural include total deprivation of the right to counsel, lack of an

impartial trial judge, unlawful exclusion of grand jurors of the defendant's race, denial of the right to self-representation at trial, denial of the right to a public trial, and an erroneous reasonable-doubt jury instruction. *See Johnson*, 520 U.S. at 468–69.

¶26 *Fulminante* identified two primary hallmarks of structural error: (1) a lack of comparable, admissible evidence against which to measure the effect of the error; and (2) a tendency for the error to compromise the trial's reliability "as a vehicle for determination of guilt or innocence," such that it is difficult to regard any criminal punishment as "fundamentally fair." 499 U.S. at 307–08, 310 (cleaned up). The Court has since suggested structural errors need not carry both hallmarks as long as they bear one—or if there is some other compelling reason to deem an error structural. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006). In some cases, the Court has "rest[ed] [its] conclusion" solely on "the difficulty of assessing the effect of the error," while in others fundamental unfairness was the dominant consideration. *Id.* Still others have relied on the "irrelevance of harmlessness." *Id.*

¶27 The Court has also explained that its approach to structural error tends to be "categorical." *Neder v. United States*, 527 U.S. 1, 14 (1999). That is, for an error to qualify as structural, it must "produce[] consequences that are *necessarily* unquantifiable and indeterminate," *id*. at 11 (emphasis added), or "*necessarily* render a criminal trial fundamentally unfair," *id*. at 9. These are the sort of errors that "deprive defendants of 'basic protections' without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *Id.* at 8–9 (cleaned up). In so holding, the Court rejected a proposal to divide a single kind of constitutional error into trial and structural subtypes based on an initial factual determination, explaining that the proposal was incompatible with the concept of structural error. *See id*. at 13–14 (criticizing a party for "import[ing] into the initial structural-error determination . . . a case-by-case approach that is more consistent with our traditional harmless-error inquiry").

¶28 As noted, the Court has in several cases considered the claim that structural errors should be exempt from the plain error standard's prejudice inquiry. *Puckett*, 556 U.S. at 140 (collecting cases). However, in each case, the Court rejected the argument that the constitutional violation at issue was structural, obviating any need to rule on the ultimate question. *See id.* at 140–41.

2. Errors Entitled to a Presumption of Prejudice

¶29 In contrast to its frequent discussion of a potential relationship between structural error and the prejudice requirement of plain error, the Court has not revisited the possibility of presuming prejudice post-*Olano*. Several circuit courts, however, have adopted such presumptions. To determine whether a presumption of prejudice is appropriate, courts have typically looked to (1) whether "the inherent nature of the error [makes] it exceptionally difficult for the defendant to demonstrate" prejudice, *United States v. Barnett*, 398 F.3d 516, 526–27 (6th Cir. 2005), and sometimes also (2) whether the error affects an important right, such that the trial or sentencing process has been rendered "presumptively unreliable" or has had its "legitimacy . . . called into question," *United States v. Adams*, 252 F.3d 276, 288 (3d Cir. 2001).

¶30 Astute readers may notice these are similar to the criteria most often used to distinguish between trial and structural error. *See supra* ¶ 26; *cf. Gonzalez-Lopez*, 548 U.S. at 149 n.4. Despite that important overlap between the two inquiries, however, the question of whether to presume prejudice differs in several important ways from a structural error determination. First, structural errors are a subset of constitutional errors, whereas the presumption of prejudice can cover non-constitutional errors as well. *See Adams*, 252 F.3d at 288. Second, errors presumed prejudicial need not have a pervasive, all-encompassing effect on the proceedings—there is no requirement that the errors affect "[t]he entire conduct of the trial from beginning to end" or "the framework within which the trial proceeds." *See Fulminante*, 499 U.S. at 309–10.

¶31 Third, the presumption of prejudice is not always categorical. *Compare Neder*, 527 U.S. at 14, *with Adams*, 252 F.3d at 287 n.10. Some errors to which the presumption has been applied are not capable of causing prejudice in every case. For example, some courts have reasoned that when a judge hands down the lowest permissible sentence, there is no possibility that exercise of the right to allocution could have produced a lower sentence. *See, e.g.*, *Adams*, 252 F.3d at 287 n.10 ("[W]hen the defendant is sentenced at the bottom of a Guidelines range, there is [generally] no opportunity for a violation of the right of allocution to have played a role in the district court's sentencing decision . . . ."); *United States v. Reyna*, 358 F.3d 344, 351 n.6 (5th Cir. 2004) (en banc) ("[Several circuits] have concluded that resentencing is not required if the defendant received the lowest possible sentence at the bottom of the guideline range and no

arguments were made to the sentencing court that the range was incorrect for any reason."). Accordingly, depending on the right at issue, a defendant may need to make a threshold showing that the right "*could have*" influenced the outcome of the proceedings had it been properly exercised. *See United States v. Luepke*, 495 F.3d 443, 451 (7th Cir. 2007); *see also, e.g.*, *Adams*, 252 F.3d at 287 ("[W]e should presume prejudice when a defendant shows a violation of the right [to allocution] *and* the opportunity for such a violation to have played a role in the district court's sentencing decision."); *Barnett*, 398 F.3d at 529 (presuming prejudice where a "distinct possibility" existed that the defendant might have received a lesser sentence absent the error).

¶32 Flowing from this non-categorical approach, many courts permit the government to offer evidence to rebut the presumption of prejudice—effectively shifting the burden to the government to prove any error was harmless. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 156–57 (3d Cir. 2019) (specifying that the presumption of prejudice is rebuttable); *United States v. Syme*, 276 F.3d 131, 154–55 (3d Cir. 2002) (same); *Barnett*, 398 F.3d at 529 (same). As the Sixth Circuit explained, "while an appellate court will normally be unable to assess the significance of any . . . error that might have been made, we can imagine cases where the trial record contains clear and specific evidence" that exercise of the right would not have made a difference. *Barnett*, 398 F.3d at 529 (cleaned up).

### 3. Errors That Demonstrate Prejudice by Themselves

¶33 While the Supreme Court has yet to ratify either *Olano* exception, it did adopt a quasi-exception to plain error prejudice in *Molina-Martinez*, 578 U.S. 189. *Molina-Martinez* dealt with a challenge to a criminal sentence calculated under an incorrect guidelines range. *See id.* at 191. Under the federal sentencing scheme, the United States Probation Office calculates a sentencing range based on the Federal Sentencing Guidelines and factors described in rule 32 of the Federal Rules of Criminal Procedure. *See id.* at 193. The district court must consult this Guidelines range but retains discretion to depart from it. *Id.*

¶34 The question in *Molina-Martinez* was whether a defendant could demonstrate plain-error prejudice when the Probation Office calculated the incorrect Guidelines range and the district court handed down a sentence within that range. *See id.* at 194–95. The United States Court of Appeals for the Fifth Circuit held that Molina-Martinez could not demonstrate prejudice because he had not

pointed to any "additional evidence" in the record that "the Guidelines range was a primary factor in sentencing"—such as a statement from the judge to that effect. *Id.* at 197 (cleaned up).

¶35 On appeal to the Supreme Court, Molina-Martinez argued that Guidelines errors should be subject to a presumption of prejudice under *Olano*. Brief for Petitioner at 13, Molina-Martinez v. United States, 578 U.S. 189 (2016) (No. 14-8913), 2015 WL 7294866. Molina-Martinez's understanding of *Olano* differed somewhat from that of many federal circuits. He agreed that to qualify for a presumption of prejudice, an error must be of such a type that a defendant will likely not be able to make "a specific showing of prejudice." *Id.* at 12 (quoting *Olano*, 507 U.S. at 735). But in his view, something more was required. He argued that "any presumption of harm should be based upon empirical evidence and experience that the 'natural effect' of a particular type of error is to affect substantial rights." *Id.* at 27 (citing *Shinseki v. Sanders*, 556 U.S. 396, 411 (2009) and *Kotteakos v. United States*, 328 U.S. 750, 765–66 (1946)). Molina-Martinez accordingly marshalled empirical evidence to argue that Guidelines errors affect the typical federal sentence. *Id.* at 31–38.

¶36 The Supreme Court ruled in Molina-Martinez's favor and adopted his empirical mode of reasoning—but it pointedly refused to describe its approach as a presumption. It held that "[w]hen a defendant is sentenced under an incorrect Guidelines range . . . *the error itself* can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 578 U.S. at 198 (emphasis added). The Court based this rule on its view that the Federal Sentencing Guidelines exercise a "real and pervasive effect" on sentencing outcomes. *Id.* at 199. Although federal sentencing is ultimately discretionary, the Guidelines "anchor the district court's discretion." *Id.* at 198–99 (cleaned up). District courts "understand that they *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Id.* at 198 (cleaned up). Thus, as a general matter, the Guidelines are "not only the starting point for most federal sentencing proceedings but also the lodestar." *Id.* at 200. Taking up Molina-Martinez's invitation, the Court relied on statistics to support its conclusion, noting that, in the preceding decade, more than 80% of federal sentences fell within the recommended Guidelines range absent a government motion for a sentence outside of that range. *Id.* at 199.

¶37 Accordingly, the Court held that "[a]bsent unusual circumstances," a defendant may "satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder." *Id.* at 201. The government remains free to point to record evidence to "counter" the defendant's "ostensible" prejudice showing. *Id.* at 200–01 (cleaned up). But where "the record is silent," the defendant will prevail—at least "in most instances." *Id.* at 201. The Court concluded that this rule was necessary because in "a significant number of cases the sentenced defendant will lack" specific evidence of the judge's thought process. *Id.* In other words, it will typically be difficult for a defendant to prove prejudice flowing from Guidelines errors using record evidence. *See id.*

¶38 *Molina-Martinez* fits somewhat uneasily within the Court's plain error jurisprudence. On the one hand, it conceived of defendants as satisfying their burden to show prejudice, *see id.* at 201, rather than, as under the *Olano* categories, qualifying for a presumption that shifts the prejudice burden to the government or else provides a categorical exemption from harmlessness review, *see id.* at 203. On the other hand, *Molina-Martinez* recognized that allowing "the error itself" to speak to prejudice had the effect of awarding "most" ties—cases where "the record is silent"—to the defendant. *Id.* at 198–99, 201. Despite the Court's caveat limiting the implications of a silent record to "most" cases, it is not readily apparent how the government *could* counter the systemic likelihood of prejudice from Guidelines error without direct evidence. Nevertheless, *Molina-Martinez* insisted that its holding did not amount to a burden-shifting presumption but merely foreclosed operation of "a categorical rule" against demonstrating prejudice through non-record evidence. *See id.* at 203.

*B. Plain Error and the Right to Allocute in the Federal Circuits*

¶39 The majority of federal circuits have declined to require the ordinary prejudice showing from defendants on plain error review of denial of the right to allocution. *See United States v. Bustamante-Conchas*, 850 F.3d at 1137–38 (collecting cases). But their approaches differ. Some circuits apply a tradition of per se reversal that predates *Olano* and thus does not situate the exception within more recent plain error jurisprudence. *See, e.g.*, *United States v. De Alba Pagan*, 33 F.3d 125, 129–30 (1st Cir. 1994) (tracing per se reversal back to a 1689 English common law decision); *see also Adams*, 252 F.3d at 285 n.7 (collecting cases).

¶40 Other circuits employ some version of the *Olano* presumption. *See, e.g.*, *Adams*, 252 F.3d at 287; *United States v. Haygood*, 549 F.3d 1049, 1055 (6th Cir. 2008). These circuits have tended to ground this result in "the nature of the right" to allocation and "the difficulty of proving prejudice from its violation." *Adams*, 252 F.3d at 287. On the nature of the right, the Third Circuit reasoned that allocation is "the type of important safeguard" without which a sentencing proceeding's "legitimacy is called into question." *Id.* at 288. To deny the right of allocation is "tantamount to denying [a defendant's] . . . most persuasive and eloquent advocate," *id.*, because, as a plurality of the Supreme Court once put it, "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself," *id.* (quoting *Green v. United States*, 365 U.S. 301, 304 (1961) (plurality opinion)). A sentence rendered without the benefit of a defendant's "unique perspective on the circumstances relevant to his sentence, delivered by his own voice," is, some circuits have concluded, "presumptively unreliable." *Id.*

¶41 Relative to the difficulty of proving prejudice, various circuits have noted that "the impact of the omission [of allocation] on a judge's discretionary sentencing decision is usually enormously difficult to ascertain." *Id.* at 288 (cleaned up); *accord Reyna*, 358 F.3d at 351 (concluding that a defendant would have an "onerous burden" establishing prejudice under the traditional standard); *Haygood*, 549 F.3d at 1055 (explaining that "prejudice is effectively presumed when allocation is overlooked because of the difficulty in establishing that the allocation error affected the outcome of the district court proceedings" (cleaned up)); *Luepke*, 495 F.3d at 451 (noting "the immense practical difficulty facing a defendant who otherwise would have to attempt to prove that a violation affected a specific sentence").

¶42 Many of these decisions posit a correlation between a sentencing court's degree of discretion and a defendant's ability to demonstrate prejudice: generally speaking, the greater a court's discretion, the harder it will be for a defendant to prove prejudice. *See, e.g.*, *Adams*, 252 F.3d at 287; *Luepke*, 495 F.3d at 451. The Seventh Circuit drew out this relationship the most explicitly. It noted that the argument for presuming prejudice stemming from allocation errors "ha[d] even more to recommend it" in the wake of a Supreme Court decision that rendered the federal sentencing Guidelines advisory. *Luepke*, 495 F.3d at 451 (discussing *United States v. Booker*, 543 U.S. 220 (2005)). That decision left district courts to the

"reasonable exercise of [their] discretion" in sentencing. *See id.* Under such a regime, the Seventh Circuit reasoned, it is "almost impossible" to determine the likely effect of a hypothetical allocution statement on sentencing. *Id.*

¶43 The Tenth Circuit charted a different course in *Bustamante-Conchas*. Prior to that decision, the Tenth Circuit treated allocution errors as either per se or presumptively prejudicial. 850 F.3d at 1138. However, it came to view these descriptors as "technically inaccurate." *Id.* at 1139. Instead, it reconceived its approach under a framework inspired by *Molina-Martinez*, holding that "a defendant who shows he has been denied the right to allocute has *met his burden* of demonstrating prejudice absent some extraordinary circumstance." *Id.* (emphasis added).

¶44 *Bustamante-Conchas* mirrored *Molina-Martinez* every step of the way. Where the latter cited statistics showing more than 80% of federal sentences fall within the recommended Guidelines range (absent a government motion to depart from it), 578 U.S. at 199, the former cited a survey that found that over 80% of federal district judges consider allocution "at least 'somewhat important' in arriving at a final sentence," 850 F.3d at 1139 (citation omitted). Just as *Molina-Martinez* reasoned that the "ordinary" impact of the Guidelines range on sentencing may substitute for a more direct showing of prejudice, so *Bustamante-Conchas* held that the likelihood that allocution matters in "the usual case" may satisfy the prejudice requirement without additional, case-specific evidence. *See id.*

¶45 *Bustamante-Conchas* acknowledged that in some cases, there may be "exceptionally good reason to doubt" that allocution would have mattered. *See id.* at 1140. This bucket of "exceptional circumstance[s]" includes, but is not necessarily limited to, cases where the defendant is sentenced at or below the statutory minimum. *Id.* This language tracks, although it is somewhat more restrictive than, *Molina-Martinez*'s allowance that the government may "counter" a defendant's error-alone prejudice showing with record evidence. *Compare id., with Molina-Martinez*, 578 U.S. at 200–01.

*C. The Utah Court of Appeals' Opinion*

¶46 Our court of appeals wanted to "adopt" *Bustamante-Conchas*'s approach to prejudice for allocution errors. *See James*, 2023 UT App 80, ¶ 22. But, perhaps because *Bustamante-Conchas* is a bit slippery in its analysis, it is not always easy to discern what portion of *Bustamante-Conchas* the court of appeals sought to import into

Utah law. At times, the court of appeals quotes *Bustamante-Conchas* for the rule that, absent extraordinary circumstances, defendants may "satisfy" or "me[e]t" their burden of prejudice merely by showing that they have been deprived of the right to allocute. *Id.* ¶ 24 (quoting 850 F.3d at 1134, 1139). But at other times, the court of appeals describes *Bustamante-Conchas* as holding that allocution errors are "per se or presumptively prejudicial." *See id.* ¶¶ 24, 27 (cleaned up).

¶47 As explained above, we do not read *Bustamante-Conchas* to have adopted a presumption of prejudice framework. Rather, the language the court of appeals quotes to that effect comes from *Bustamante-Conchas*'s descriptions of the Tenth Circuit's *prior* approach, which *Bustamante-Conchas* itself disavowed. *See* 850 F.3d at 1133, 1139, 1141 n.7, 1142. *Bustamante-Conchas* instead tracked the approach of *Molina-Martinez*, *id.* at 1139–40, which had also rejected a presumption framework, *see Molina-Martinez*, 578 U.S. at 203. Ultimately, the court of appeals' opinion can be read to have adopted both approaches *Bustamante-Conchas* discussed—an *Olano* presumption of prejudice and a *Molina-Martinez*-type rule that error alone can demonstrate prejudice.

¶48 The haziness surrounding *Bustamante-Conchas* is understandable. The Tenth Circuit's opinion is not always precise about whether it is announcing a new rule or merely putting old wine in a new bottle—that is, recasting the existing rule in different language while leaving its substance intact. *Compare* 850 F.3d at 1139 (describing *Molina-Martinez* language as "a more precise description of our jurisprudence" than the *Olano* framework), *with id.* at 1141 n.7 ("choos[ing] not to accept" the "position that prejudice should be presumed"). Additionally, the opinion drew two dissents, each of which refused to credit the majority's fine distinctions. One declared that the majority had "effectively" shifted the burden to the government by not requiring a specific showing of prejudice "based on the record on appeal." *Id.* at 1145–46 (Tymkovich, C.J., dissenting) (cleaned up). The other averred that it could not distinguish the rule the majority adopted from a presumption. *See id.* at 1148 (Hartz, J., dissenting).

¶49 It may be true that *Molina-Martinez* error-alone prejudice and the *Olano* presumption of prejudice differ little in practical effect. But the two are distinguished by different substantive concerns and require different showings to persuade a court to adopt them. The two rules share an initial consideration in common: it must be

15

difficult for a defendant to prove prejudice from record evidence, at least in the typical case. *Compare Molina-Martinez*, 578 U.S. at 201 (noting that in "a significant number of cases . . . defendants will lack" evidence of a sentencing judge's view of the federal Guidelines), *with Adams*, 252 F.3d at 285 (holding that "some errors to which no objection was made should be 'presumed prejudicial' if the defendant cannot make a specific showing of prejudice" (quoting *Olano*, 507 U.S. at 735)).

¶50 From there, however, the standards diverge. The characteristic feature of *Molina-Martinez* error is that prejudice must be likely in the "usual," *Molina-Martinez*, 578 U.S. at 204, or "ordinary," *Bustamante-Conchas*, 850 F.3d at 1133, case. That likelihood—deduced from system-wide surveys or other data—justifies a court in concluding that a defendant has in fact shown a reasonable probability that the error mattered to the outcome. *See Molina-Martinez*, 578 U.S. at 1349 (concluding that the Guidelines range affects "most" federal sentences and that this probability "is all that is needed" to establish a reasonable probability of a different outcome in most cases); *Bustamante-Conchas*, 850 F.3d at 1139 (finding "a reasonable probability that allocution matters in the usual case" and concluding that this probability is enough to demonstrate prejudice absent extraordinary circumstances).

¶51 The *Olano* presumption, on the other hand, tends not to involve statistical probabilities of prejudice. Instead, it employs a less restrictive version of the framework often used for structural error. *See supra* ¶¶ 29–32. When weighing whether to apply an *Olano* presumption, courts consider the relative importance of the right at issue and the effect of its absence on the reliability and integrity of proceedings alongside the difficulty of proving prejudice from the record. *See, e.g., Adams*, 252 F.3d at 288 (finding it "appropriate to presume prejudice because the sentencing process itself was rendered presumptively unreliable" by deprivation of the right to allocute); *Syme*, 276 F.3d at 154 (discussing *Adams* and concluding that "[l]ike a denial of the right of allocution, a constructive amendment [to an indictment] also violates a basic right of criminal defendants").

¶52 All of this leaves some question as to the nature of the task before us. Under which of these rubrics should we evaluate denial of Utah's constitutional right to allocute at sentencing? Ultimately, we think the applicability of the *Molina-Martinez* framework is what is properly under our review. The court of appeals found the Tenth

Circuit's approach "compelling," *James*, 2023 UT App 80, ¶ 22, so we turn directly to *Bustamante-Conchas* to see whether we also find its approach compelling. We do so bearing in mind that *Bustamante-Conchas* used *Molina-Martinez* as its blueprint and explicitly rejected the *Olano* presumption framework prevalent in other circuits. *See Bustamante-Conchas*, 850 F.3d at 1138–39, 1141 n.7.

¶53 Accordingly, we address the State's arguments to the extent they touch on our reading of the Tenth Circuit test—that is, to the extent they militate against treating allocution error as a species of *Molina-Martinez* error. We first take up the State's claim that our caselaw precludes adoption of the Tenth Circuit test by asking whether we have ever barred defendants from demonstrating plain error prejudice through non-record or systemic evidence. We conclude that we have not and next consider whether prejudice is so likely in the typical Utah sentencing proceeding that a defendant can be said to have demonstrated prejudice merely by presenting an appellate court with "an ordinary denial" of the right to allocute. *See Bustamante-Conchas*, 850 F.3d at 1141.

## II. THIS CASE PRESENTS AN ISSUE OF FIRST IMPRESSION

¶54 The State argues that we have foreclosed adoption of a *Bustamante-Conchas*-style rule through two lines of caselaw. Most directly, the State contends that our allocution cases establish that even preserved allocution errors are reviewed "for harmlessness by examining what potential effect the defendant's proffered allocution would have had in light of the sentencing record as a whole." This line of cases is inconsistent with the court of appeals' opinion, the State argues, because it would not make sense to impose a higher burden on preserved claims than unpreserved claims of the same type. But even were we to "revisit" those cases, the State maintains that our plain error doctrine would still dispose of James's claim because that doctrine requires a showing of "actual prejudice" for *all* unpreserved claims. We address each argument in turn.

### A. We Have Not Foreclosed an Indirect Showing of Prejudice for Denials of the Right to Allocution

¶55 The State points to *State v. Young*, 853 P.2d 327 (Utah 1993), for the proposition that preserved allocution errors are subject to harmless error review. But the State misidentifies the controlling holding of *Young*. The State's brief cites to *Young*'s lead opinion, which would have held that denial of the right to allocution is always subject to harmlessness review and was harmless in Young's case.

(Citing *Young*, 853 P.2d at 359–60.) But the lead opinion lost the majority on the allocation issue.

¶56 Instead, three justices, writing across three separate opinions, held that the allocation error required reversal. Justice Durham wished to subject preserved allocation errors in capital cases to per se reversal—i.e., to reverse without any inquiry into harmlessness. *Id.* at 375 (Durham, J., concurring in part and dissenting in part). The other two justices did not think they needed to go that far. *Id.* at 417–18 (Zimmerman, J., concurring in part and dissenting in part); *id.* at 418 (Stewart, J., concurring in part and dissenting in part). They believed that the denial of allocation had prejudiced Young, and so the court could reverse without deciding whether allocation error "warrants an automatic reversal or whether it is to be appraised under our usual harmless error rule." *Id.* at 417–18 (Zimmerman, J., concurring in part and dissenting in part); *see id.* at 418 (Stewart, J., concurring in part and dissenting in part). Although Justice Durham favored a per se rule, she agreed that, even without one, reversal of Young's death-penalty sentence was required because a different outcome was reasonably likely in the event Young had been permitted to speak. *Id.* at 376 (Durham, J., concurring in part and dissenting in part).

¶57 That narrower ground represents *Young*'s controlling reasoning on allocation. But it is not extraordinarily useful here, since it rested on *Young*'s facts and deferred the legal question of whether allocation errors are exempt from harmlessness review.

¶58 The State relies on *State v. Anderson*, 929 P.2d 1107 (Utah 1996), for the same proposition—that preserved allocation errors are subject to a prejudice requirement. But *Anderson* did not decide that question either. In *Anderson*, we held that a defendant waived his right to be present at sentencing when, despite having adequate notice and an opportunity to appear, he voluntarily absented himself from proceedings. *Id.* at 1111. As one "practical consideration[]" weighing in favor of our holding, we noted that the Eleventh Circuit had "held that a showing of prejudice is necessary to uphold a due process challenge against an in absentia proceeding" and that Anderson had failed to make such a showing. *Id.* (citing *Dasher v. Stripling*, 685 F.2d 385, 387–88 (11th Cir. 1982)). The parties spill much ink debating whether our brief discussion of the Eleventh Circuit's rule constituted an independent basis for our holding or dicta.

¶59 But we need not resolve that dispute. Even if we did adopt the Eleventh Circuit's rule in *Anderson*, it would not help the State.

First, all we discussed in the disputed passage of *Anderson* was the threshold question of whether a prejudice requirement applied to a claim at all. We did not list every way in which that requirement might be satisfied.

¶60 Second, *Anderson* did not deal with the same kind of error we confront in this case. We decided *Anderson* on the basis of waiver. *Id.* at 1111. But plain error rests on principles of forfeiture, not waiver. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining that "[m]ere forfeiture, as opposed to waiver, does not extinguish an 'error'" for purposes of plain error review); *see also id.* ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (cleaned up)); *accord State v. Bond*, 2015 UT 88, ¶ 42, 361 P.3d 104 (discussing *Olano*). Therefore, *Anderson* does not dictate our resolution of this appeal.

### B. We Have Not Foreclosed an Indirect Showing of Prejudice for All Plain Error Claims

¶61 The State relies principally on *State v. Bond*, 2015 UT 88, 361 P.3d 104, for the proposition that all unpreserved claims require a defendant to show "actual prejudice." If we take the State's use of "actual prejudice" to mean a record-specific showing of a reasonable probability of a different outcome, then the State inflates the scope of *Bond*'s holding.

¶62 The appellant in *Bond* argued that when a defendant raises an unpreserved claim arising under the U.S. Constitution, the burden shifts to the State to prove that the error was "harmless beyond a reasonable doubt." *Id.* ¶¶ 35, 37. This proposed rule involved two distinct components: burden-shifting and the imposition of a "heightened review standard" on the State. *See id.* ¶¶ 37–39, 44. Whereas the default plain error standard requires the defendant to show a reasonable probability that an error was harmful, the appellant's preferred rule—derived from the Supreme Court's test in *Chapman v. California*, 386 U.S. 18 (1967)—would have the State prove constitutional error harmless beyond a reasonable doubt.

¶63 In rejecting the defendant's proposed application of *Chapman*'s "heightened standard of review," *Bond* did no more than affirm that unpreserved federal constitutional claims are, like other unpreserved claims, "to be reviewed under our plain error doctrine." *Bond*, 2015 U5 88, ¶ 44. *But see id.* ¶ 38 n.11 (noting that *Bond*'s holding does not necessarily extend to capital cases, "which may

garner unique review under our case law"). Notably, *Bond* did not say that under plain error review, the burden can never shift to the State to show a lack of prejudice under the mirror image of the defendant's standard—i.e., that there is no reasonable probability of a different outcome. Nor did *Bond* discuss whether defendants might ever employ non-record evidence to demonstrate prejudice.

¶64   In sum, we see no reason to read *Bond* as deciding anything more than what was necessary to dispose of the briefed argument that "preservation is immaterial" when a claimed error arises under the federal constitution. Preservation would remain material even under a burden-shifting presumption. Under such a presumption, it is true that the State would bear the *burden* of proof for both preserved and unpreserved errors. But the *standard* of proof would differ: harmlessness beyond a reasonable doubt for preserved errors and no reasonable probability of harm for unpreserved ones.

¶65   *Bond*'s use of federal case law reinforces our reading. *Bond* framed its holding as updating Utah law to track more recent federal cases. *See id.* ¶ 41. One of these federal cases, *Johnson v. United States*, 520 U.S. 461 (1997), had determined that even structural errors are subject to plain error review. *See id.* at 466. That is, as we parsed *Johnson*'s holding in *Bond*, unpreserved constitutional claims are neither "per se reversible" nor are they reviewed "under the heightened *Chapman* standard." *See Bond*, 2015 UT 88, ¶ 43. They are instead "subject to preservation requirements," including "a harmlessness analysis." *Id.*

¶66   But *Johnson* did not limit the ways in which harm might be shown under the plain error test. *See* 520 U.S. at 468–69. To the contrary: it entertained an argument that structural errors are per se prejudicial. *See id.* Ultimately, *Johnson* did not rule on that argument because it resolved the case on the discretionary fourth prong of the federal plain error standard. *See id.* at 469–70. But the Supreme Court has continued to consider similar arguments. *See Puckett v. United States*, 556 U.S. 129, 140–41 (2009) (collecting cases). And the Court has never imposed the kind of strict, record-specific prejudice requirement onto defendants that the State reads into *Bond*. Indeed, it did just the opposite in *Molina-Martinez*—the very case that inspired *Bustamante-Conchas*.

¶67   And that takes us to the critical flaw in the State's argument. It does not make much sense to read *Bond* as adopting any rule more stringent than the federal standard upon which it "[b]ased" its holding. *See* 2015 UT 88, ¶ 44. It makes even less sense to take a case

which endeavored to keep Utah law current with its federal counterpart, *see id.* ¶ 41, to foreclose our adoption of a federal standard promulgated subsequent to *Bond.*[2]

¶68 We have not decided whether defendants may meet their prejudice burden through the kind of indirect, system-wide evidence at issue in *Bustamante-Conchas* and *Molina-Martinez*. We now turn to whether application of the *Bustamante-Conchas* rule is warranted for denials of the right to allocution in state criminal proceedings.

III. THE COURT OF APPEALS ERRED WHEN IT ADOPTED *BUSTAMANTE-CONCHAS*'S APPROACH TO PREJUDICE

¶69 While we have left the door open to *Molina-Martinez* error, we decline to walk through it in this case. Allocution errors in state sentencing proceedings do not meet that exception's key requirement: a high probability of prejudice in the ordinary case. The court of appeals was not presented with any evidence that exercise of the right to allocution affects the typical *Utah* sentence. And we have reason to doubt that it does, given important differences between Utah and federal sentencing schemes.

¶70 Federal district courts sentence defendants to a fixed term of imprisonment in a version of what is known as a determinate sentencing regime. *See United States v. Booker*, 543 U.S. 220, 235–36 (2005). Judges retain wide discretion under this regime and can vary

---

[2] The State also relies on *State v. Holgate*, 2000 UT 74, 10 P.3d 346. *Holgate* is not dispositive for the same reason *Bond* is not: it merely states the elements of plain error without addressing the question of whether prejudice might ever be shown through indirect or non-record evidence. *See id.* ¶ 13. Notably, in reciting the plain error standard, *Holgate* quotes a case wherein we qualified that the burden to establish prejudice rests on the appellant "[i]n general." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993), *abrogated on other grounds by State v. Silva*, 2019 UT 36, 456 P.3d 718; *see Holgate*, 2000 UT 74, ¶ 13. This phrasing aligns with federal cases that specify the defendant bears the burden of showing prejudice only in "the ordinary case" or in "most cases." *See, e.g., Molina-Martinez v. United States*, 578 U.S. 189, 195 (2016); *Olano*, 507 U.S. at 734. By its terms, such language leaves open the possibility that the burden may appropriately shift or that the element may be met through non-record evidence.

the duration of a sentence by as little as one month.[3] By contrast, Utah employs an indeterminate sentencing regime, under which "the trial judge [ordinarily] has no discretion in fixing the term of imprisonment."[4] *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 907 (Utah 1993) (cleaned up). Instead, the trial judge "simply imposes the statutorily prescribed range of years, and the Board of Pardons determines exactly how long the prisoner is to be confined." *Id.* (cleaned up). As such, the Board of Pardons "performs a function analogous to that of the trial judge in jurisdictions that have a determinate sentencing scheme."[5] *Id.* at 908 (cleaned up). Utah trial judges still have some discretion, but it is largely confined to two binary determinations: between probation and prison, *see* UTAH CODE § 77-18-105(2), and between consecutive and concurrent sentencing when a defendant is convicted of multiple crimes, *see id.* § 76-3-401.

¶71 The gulf in discretion granted state and federal judges undercuts the persuasive value of *Bustamante-Conchas*'s reasoning. Even if *Bustamante-Conchas* were correct that "allocution matters in the usual [federal] case," 850 F.3d at 1139, we see no warrant for

---

[3] *See* U.S. SENT'G GUIDELINES MANUAL § 5A (Sentencing Table) (U.S. SENT'G COMM'N 2025), available at https://www.ussc.gov/guidelines/2025-guidelines-manual/annotated-2025-chapter-5 (last visited Nov. 4, 2025).

[4] The Legislature has excepted certain crimes from this general rule, permitting trial judges some discretion to hand down a lower sentence if they find that doing so is "in the interests of justice." *See* UTAH CODE §§ 76-5-302(5) (aggravated kidnapping), -402.1(5) (rape of a child), -402.3(4) (object rape of a child), -403.1(5) (sodomy on a child). Notably, a court "may not grant probation" for any of the crimes for which such an exception has been adopted. *Id.* § 76-3-406(2).

[5] After sentencing, the Board of Pardons generally schedules an "original hearing" where it fixes the length of an offender's prison term. *See* UTAH ADMIN. CODE R671-201. By rule, offenders have a "right to be present" at this hearing (as long as they are "housed in the state"). *Id.* R671-301-1(2). As part of the right to be present, "[t]he offender may speak, present documents, ask questions of the hearing official, and answer questions." *Id.* This right may serve some of the informational functions that allocution tends to serve in determinate sentencing regimes.

concluding that allocution matters in the same way or to the same extent in the typical Utah case. The sources *Bustamante-Conchas* relied upon do not include any Utah data, *see id.*, and the differences between our sentencing regimes sharply limit any inferences that might be drawn from federal data. At no point below has James cited additional sources, Utah-based or otherwise, tending to show that allocution makes a difference in the typical indeterminate sentencing proceeding.

¶72 And we are skeptical that it does. As a general rule, the wider a sentencing judge's discretion, the greater the chance that any information presented "in mitigation of punishment," including an allocution statement, *see* UTAH R. CRIM. P. 22(a), might affect a sentence. *Cf. Luepke*, 495 F.3d at 451. Because Utah judges are confined to largely binary decisions at sentencing, the odds that allocution will affect a given sentence are relatively small. Allocution certainly *might* matter, particularly in a close case. But that is not enough for us to conclude that the existence of an allocution error, where a defendant has not asked to allocute, by itself demonstrates prejudice flowing from that error.[6] Where we cannot conclude that an error matters in the typical case, *Bustamante-Conchas* and *Molina-Martinez* have no application.

IV. JAMES HAS NOT PROVIDED ANY DIRECT EVIDENCE OF PREJUDICE

¶73 Our default rule for unpreserved state constitutional claims is that a defendant must demonstrate prejudice. *See State v. Bond*, 2015 UT 88, ¶ 41 n.14, 361 P.3d 104. Although we explained above that plain error prejudice might be demonstrated indirectly, James has not done so here, because, in Utah, allocution errors are not of the type that generally affect the outcome of sentencing proceedings. The State argues that, at this stage, James's remaining route to sustaining the court of appeals' judgment lies in demonstrating

---

[6] That is not to say that allocution is an unimportant part of sentencing in Utah. To the contrary, allocution has many potentially important roles. It can be salutary for victims to hear a defendant take responsibility for his actions and acknowledge the harm his crimes have caused. Allocution can help a defendant, who may have been largely silent throughout the proceedings, feel seen and heard by the criminal justice system. What we cannot conclude, on the briefing before us, is that prejudice generally occurs when a Utah defendant who has not asked for the opportunity to address the court is sentenced without allocuting.

prejudice through case-specific evidence. We agree and conclude that James has failed to make such a showing.[7]

¶74   To demonstrate prejudice in this setting, a defendant must establish what they would have said had they been permitted to allocute. In some cases, this can be done using material that is already in the record, such as statements from counsel or letters from the defendant to the court. The idea is to point to mitigating circumstances or expressions of remorse that could conceivably influence sentencing. Since the material is already in the record, the district court is presumed to have been aware of it when it handed down its sentence. But a defendant is free to point to evidence that the court failed to take adequate account of this information or to argue the court would have metabolized the same information differently if it had been presented in the defendant's own voice.

¶75 Other times, there may not be enough information in the record to establish the content of an allocution statement. In these cases, our decision might be aided by a record supplemented to include more information about the allocution the defendant would have made. To the extent that the Utah Rules of Appellate Procedure do not currently account for all circumstances in which a defendant in James's position would want to supplement the record, we encourage our appellate rules committee to consider changes to the rules.

¶76 Here, James has pointed to some record evidence that fleshes out a likely allocution statement. Counsel below told the district court that James's crimes had their roots in opioid addiction, and James himself wrote letters to the court expressing contrition and asking for a chance to "prove [his] valiancy in truly wanting to

---

[7] As explained above, federal caselaw recognizes three potential exceptions to the ordinary plain error burden. Our holding in this case is limited to the application of a *Molina-Martinez* exception for allocution error. As outlined in section II, *supra*, we have not previously decided whether allocution errors are structural, nor whether they should be entitled to a rebuttable presumption of prejudice. Given the briefing and procedural posture of this case, we do not think it is wise to reach these questions. Thus, per our default rule, James is limited to showing prejudice from the record. But a future party should feel free to brief the applicability of the remaining federal exceptions to plain error prejudice or to advocate for a different test on state law grounds.

change." On the basis of these statements, James contends that "there is a reasonable likelihood of a more favorable result if [he had been] permitted to personally express his desire to change and receive treatment."

¶77 We disagree. The district court rejected the unanimous request of James, the State, and AP&P to grant probation—in large part because it believed that James's long criminal history undermined his claims of remorse. Under these circumstances, we are hard-pressed to conclude that a spoken statement of contrition, however emotional, would have changed the court's mind. As such, we conclude that James has failed to establish a reasonable probability of receiving a lesser sentence had he been permitted to allocute.[8]

---

[8] We readily concede the dissent's point that it can be difficult for a defendant to demonstrate prejudice related to denial of the chance to allocute. *See infra* ¶¶ 87–93. But the same is true for many kinds of errors that occur during trial. This is why the inquiries into whether to presume prejudice or to deem an error structural tend to be comparative. *See, e.g.*, *United States v. Syme*, 276 F.3d 131, 154 (3d Cir. 2002) ("Like a denial of the right of allocution, a constructive amendment also violates a basic right of criminal defendants . . . ."); *Puckett v. United States*, 556 U.S. 129, 141 (2009) (declining to consider breach of a plea agreement structural error because "it shares no common features with errors we *have* held structural").

That is, the question to be answered is whether the difficulty of assessing the effect of allocation error is "greater . . . than with respect to other procedural errors at sentencing," *see Puckett*, 556 U.S. at 141, or whether "the inherent nature of [allocation] error [makes] it *exceptionally* difficult for the defendant to demonstrate that the outcome of the lower court proceeding would have been different had the error not occurred," *United States v. Barnett*, 398 F.3d 516, 526–27 (6th Cir. 2005) (emphasis added). The briefing has not done the work to situate allocation within the pantheon of rights—to establish whether the effect of its deprivation is more or less amenable to proof than its cousins. While acknowledging the dissent's careful reasoning, we are reluctant to decide that question ourselves without the benefit of briefing focused on that inquiry. *See supra* note 7.

## CONCLUSION

¶78 The court of appeals erred when it adopted the Tenth Circuit's approach to conclude that James demonstrated that he was prejudiced when he showed that the district court did not invite him to allocute at sentencing. James has failed to establish the third element of plain error—that the error caused him to suffer prejudice—through either direct or indirect evidence. He is therefore not entitled to a new sentencing proceeding on his argument concerning the failure of the court to invite him to allocute. We remand to the court of appeals to consider James's claim that the district court abused its discretion when it sentenced James to prison instead of probation.

---

JUSTICE HAGEN, dissenting in the Opinion of the Court:

## INTRODUCTION

¶79 The majority holds that the court of appeals erred in adopting the Tenth Circuit's approach to prejudice for allocution-related errors. *See supra* ¶¶ 69–72; *see also United States v. Bustamante-Conchas*, 850 F.3d 1130 (10th Cir. 2017) (en banc). We appreciate the majority's thoughtful discussion of federal plain error and the Tenth Circuit's *Bustamante-Conchas* rule. And we agree that the significant differences between our federal and state sentencing schemes make it less likely that affording a defendant the right to allocute would alter the sentence ultimately imposed in a state proceeding. For those reasons, we, too, would reject the Tenth Circuit's rule that the denial of the right to allocute is presumptively prejudicial because it is reasonably likely to have affected the sentence.

¶80 But we would affirm the court of appeals decision on other grounds.[9] *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (recognizing that we may affirm "on any legal ground or theory

---

[9] The majority indicates that its holding is cabined—at least in part—by the briefing and procedural posture of the case. *See supra* ¶ 73 n.7. We granted certiorari to determine "[w]hether the court of appeals erred when it concluded that the defendant had necessarily demonstrated prejudice when he established that the district court had denied his right to allocution." So long as we have granted review on a particular issue, the way in which we articulate our certiorari grant should not prevent us from affirming on that issue if the court of appeals reached the right result for the wrong reasons.

apparent on the record" (cleaned up)). Instead of presuming that there is a reasonable probability that allocution would have resulted in a lower sentence, we would not require a showing of prejudice based on the likelihood of a different outcome. Allocution serves important purposes beyond mere sentence mitigation. Those purposes do not necessarily lead to a more favorable result but protect less outcome-driven goals of sentencing, the perception of procedural fairness, and a defendant's constitutional right to appear in a meaningful way. Because of the unique nature of allocution errors, we believe this is a rare instance in which it is "unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice." *State v. Arguelles*, 921 P.2d 439, 442 (Utah 1996) (cleaned up).

¶81 That said, we are sensitive to the danger of developing exceptions to the plain error rule through case law, and we respect our colleagues' objection to doing so in this case. Going forward, we support amending Utah Rule of Criminal Procedure 22 to allow defendants to obtain a new sentencing hearing when the district court fails to comply with its obligations under rule 22(a). We would welcome recommendations from our Advisory Committee on the Rules of Criminal Procedure on whether such a rule is advisable and under what circumstances resentencing should be permitted. To begin that conversation, we offer our thoughts on why the failure to invite allocution should be treated differently than other sentencing errors.

## ANALYSIS

¶82 Allocution errors will almost always be unpreserved. It would be a rare case indeed where a defendant raises the issue at sentencing and the court nonetheless denies an opportunity to allocute. Given the affirmative obligation placed on district courts under rule 22(a), *see State v. Wanosik*, 2003 UT 46, ¶ 23, 79 P.3d 937, these errors are invariably raised under the plain error exception to preservation.

¶83 Under our test for plain error, a defendant must ordinarily show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (cleaned up). No one disputes that the court's failure to comply with rule 22(a) was error and "that the law governing the error was clear at the time the alleged error was made." *State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276. The dispute turns on the third prong.

¶84 To show that an error was harmful, a defendant must ordinarily show "a reasonable likelihood of a more favorable outcome" but for the error. *Holgate*, 2000 UT 74, ¶ 13 (cleaned up). But we have previously recognized that, "pursuant to our inherent supervisory power over the courts, we may presume prejudice in circumstances where it is unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice." *State v. Arguelles*, 921 P.2d 439, 442 (Utah 1996) (cleaned up).

¶85  For example, in *State v. Brown*, the defendant argued for the first time on appeal that his constitutional rights were violated by the appointment of a part-time prosecutor as his defense counsel. 853 P.2d 851, 856 & n.2 (Utah 1992). This court relieved the defendant of the burden to prove prejudice on appeal because the alleged error was not susceptible to a traditional showing of prejudice. *Id.* at 859. In part, this court explained:

> Because a concrete showing of prejudice would be very difficult to make when a prosecutor is appointed to assist in the defense of an accused, we conclude that it is unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice. Instead, we announce a per se rule of reversal wherever such dual representation is undertaken so as to prevent its recurrence.

*Id.*

¶86  We would adopt a similar per se rule of reversal for the type of allocution error that occurred here. We would do so because the traditional showing of prejudice—that "there is a reasonable likelihood of a more favorable outcome" but for the error—is a poor fit when a defendant's right to allocute is at issue. We reach this conclusion for three reasons: (1) the inherent difficulty in proving the likelihood of a different result in cases of allocution error, (2) the purposes served by allocution beyond sentence mitigation, and (3) the weaker justification for strict adherence to preservation rules in the case of allocution.

*A. The Lack of a Record on Appeal Leaves an Appellate Court to Speculate Regarding the Prejudicial Impact of an Error Denying the Right to Allocute*

¶87 Allocution errors do not lend themselves to a traditional prejudice analysis. The denial of a defendant's constitutional right to allocute necessarily means that the defendant's statement will be

absent from the record. And without a record of what a defendant would have said, "a concrete showing of prejudice would be very difficult to make." *Brown*, 853 P.2d at 859.

¶88 The majority opinion proposes two solutions to this problem. First, it suggests that a defendant use "material that is already in the record, such as statements from counsel or letters from the defendant to the court," to identify "mitigating circumstances or expressions of remorse that could conceivably influence sentencing." *See supra* ¶ 74. But, by definition, evidence in the record was already presented to the district court and resulted in the sentence imposed. Although the majority points out that "a defendant is free . . . to argue the court would have metabolized the same information differently if it had been presented in the defendant's own voice," *supra* ¶ 74, without any evidence of how the defendant would have presented the information differently, establishing a reasonable probability of a different result would be practically impossible.

¶89 Second, the majority suggests that the defendant could supplement the record with "more information about the allocution the defendant would have made." *Supra* ¶ 75. But there is no mechanism to supplement the record on appeal with new material not previously presented to the district court. On appellate review, we are limited to the facts in the record, which "consists of the documents and exhibits filed in or considered by the trial court." UTAH R. APP. P. 11(a). "We do not consider documents that fall outside the appellate record, no matter how much they might pique our interest." *Montes v. Nat'l Buick GMC, Inc.*, 2024 UT 42, ¶ 39 n.8, 562 P.3d 688. Although rule 11(d) of the Utah Rules of Appellate Procedure speaks of "supplementing" the record on appeal, the rule is limited to correcting material "omitted from or misstated in the record" to ensure "that the record accurately reflects the proceedings before the trial court." UTAH R. APP. P. 11(d)(1)–(2). The only instance in which new material can be added to the record on appeal is found in rule 23B(a), which allows for a temporary remand to the district court "for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." *Id.* R. 23B.

¶90 The majority proposes that, if the Utah Rules of Appellate Procedure "do not currently account for all circumstances in which a defendant in James's position would want to supplement the record," we should consider modifying the rules. *See supra* ¶ 75. But even if we could discover the content of a defendant's allocution—

either by extrapolating from material already in the record or by supplementing the record through a yet-to-be-enacted rule—we would still have no way of discerning how that information would have been presented to the district court.

¶91 The right to allocute is not merely about the content conveyed in the statement; its impact lies in how it is conveyed and by whom. Defense counsel could just as easily present the information from an allocution statement to the court, but that "does not fulfill the requirements" of rule 22(a). *See United States v. Lewis*, 10 F.3d 1086, 1092 (4th Cir. 1993). "[M]uch of the value of an allocution statement lies in its ability to convey sincere remorse." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1144 (10th Cir. 2017) (en banc). As Justice Frankfurter explained, "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States*, 365 U.S. 301, 304 (1961) (plurality opinion). As a defendant presents their statement to the court "[i]t is not only the content of the defendant's words that can influence a court, but also the way [the defendant] says them." *United States v. Noel*, 581 F.3d 490, 503 (7th Cir. 2009). Before sentence is imposed, the sentencing court should see "the teary eye and trembling hand, hear[] the quaking voice" and consider the defendant's "passionate pledge that this crime was the last." *United States v. McIntosh*, 198 F.3d 995, 1006 (7th Cir. 2000) (Rovner, J., dissenting in part). Appellate courts are simply in a poor position to assess such a proffer because "sincerity and credibility are difficult to discern from a cold record." *Bustamante-Conchas*, 850 F.3d at 1144.

¶92 We likewise cannot assess the probability that the sentencing court would have been moved by the defendant's words. As federal appellate courts have noted, "defendants who have been denied allocution face a practical difficulty under the [prejudice] prong because appellate courts 'cannot speculate as to the persuasive ability of anything a defendant may have said in his statement to the court.'" *Id.* at 1139 (quoting *United States v. O'Hallaren*, 505 F.3d 633, 636 (7th Cir. 2007)). Appellate courts have no place "speculat[ing] about the persuasive force of a hypothetical allocution." *Id.* But even if an appellate court somehow could speculate as to a defendant's persuasive abilities, it "could not say with any assurance that the denial of [the defendant's] right to allocution did not affect [the defendant's] sentence." *O'Hallaren*, 505 F.3d at 636.

¶93 Without a record to review, we are left to speculate about what a defendant might have said in allocution. And even if we could determine the substance of the allocution statement, we are still left to speculate about how the defendant would have presented the statement and the persuasive force it would have had on the sentencing court. As a result, not only will the defendant face the practical difficulty of proving prejudice on appeal, but appellate courts will face similar difficulty in properly engaging in appellate review. We therefore believe that allocution is a circumstance where it is "unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice." *See Brown*, 853 P.2d at 856.

### B. In Modern Criminal Procedure, the Right to Allocute Plays a Larger Role in Sentencing than Mere Mitigation

¶94 If the difficulty of showing prejudice was our only concern, we might be inclined to adopt the rule followed by the Tenth Circuit and rejected by the majority. That rule provides that "a defendant who shows he has been denied the right to allocute has met his burden of demonstrating prejudice absent some extraordinary circumstance." *Bustamante-Conchas*, 850 F.3d at 1139; *see also supra* ¶ 43. The Tenth Circuit explained that this rule was not a per se rule or presumption of prejudice that shifted the burden of proof to the government. *Bustamante-Conchas*, 850 F.3d at 1139. Rather, under the *Bustamante-Conchas* rule, absent extraordinary circumstances, defendants would "*meet this burden* simply by showing that they were denied the right to meaningfully address the court." *Id.* at 1133 (emphasis added).

¶95 We agree with the majority that the *Bustamante-Conchas* rule relies on a statistical approach from federal sentencing that does not apply in the same way to Utah's nondiscretionary system. *See id.* at 1139–40; *see also supra* ¶¶ 44–45. We further agree that under Utah law, "the odds that allocution will affect a given sentence are relatively small." *Supra* ¶ 72. But our greater concern with the rule is that it assumes that the function of allocution is limited to the opportunity to speak in favor of mitigation. *Cf. Bustamante-Conchas*, 850 F.3d at 1140 (explaining that an "allocution error is not prejudicial if a defendant receives the lowest possible sentence").

¶96 Sentence mitigation may be the primary purpose of allocution, *see Wanosik*, 2003 UT 46, ¶ 19 (explaining that allocution allows the court to receive information regarding sentencing); UTAH R. CRIM. P. 22(a) (allowing a defendant to "present any information in mitigation of punishment"), but it plays a larger role in the

modern sentencing process. Even defendants who face mandatory sentences have a right to allocute. *See State v. Maestas*, 2002 UT 123, ¶ 48, 63 P.3d 621; UTAH CONST. art. I, § 12. And in Utah, despite the limited sentencing discretion afforded to district courts, we have recognized the right to allocution as a right of constitutional dimension. *See State v. Anderson*, 929 P.2d 1107, 1111 (Utah 1996). "Even in situations where a defendant's comments stand little chance of influencing the sentencing judge, the right retains a symbolic significance." *Bustamante-Conchas*, 850 F.3d at 1136 (cleaned up).

¶97 The Utah Constitution guarantees criminal defendants the "right to appear and defend in person" any criminal charges levied against them. UTAH CONST. art. I, § 12. While the right to allocute is not expressly granted in either the state or federal constitution, we have recognized that "[i]t is an inseparable part of the right to be present" granted in article I, section 12 of the Utah Constitution. *Anderson*, 929 P.2d at 1111. And a majority of this court later stated that *Anderson* "clearly and thoughtfully recognized a constitutionally guaranteed right to allocation." *Maestas*, 2002 UT 123, ¶ 48; *see also State v. Udy*, 2012 UT App 244, ¶ 25 n.7, 286 P.3d 345 (explaining the plurality opinion in *Maestas*, and that a majority of the court recognized a constitutional right to allocute). Due to its constitutional underpinnings, the right to allocute maintains symbolic significance because it furthers a defendant's personal participation in the proceedings against them.

¶98 We are also persuaded by other jurisdictions that have recognized that "allocution today serves purposes beyond that of sentence mitigation." *State v. Chow*, 883 P.2d 663, 672 (Haw. Ct. App. 1994). For instance, allocution is "the first step towards satisfying the sentencing objective of rehabilitation" because it presents a defendant with the opportunity to "acknowledge wrongful conduct" even where a mandatory sentence is imposed. *Id.* Such an acknowledgement can also "deter[] others from similar conduct." *Id.*

¶99 An allocution statement can serve an important therapeutic benefit for the defendant. As courts have noted, "the right of allocution has survived more for its therapeutic effect on the defendant than its practical effect on the judge's determination." *United States v. Jackson*, 700 F.2d 181, 191 (5th Cir. 1983) (cleaned up). As the Court of Appeals of Michigan stated:

> Standing convicted of a crime, the defendant should be
> accorded the right to speak regardless of whether it

> will actually affect the sentence ultimately impose[d]. While any statement the defendant may make might be 'meaningless' in terms of the sentence to be received, we cannot say that the individual defendant would regard his or her remarks as meaningless.

*People v. Smith*, 292 N.W.2d 206, 207 (Mich. Ct. App. 1980).

¶100 In some cases, allocution can be beneficial for victims as well. A defendant who admits wrongdoing and expresses remorse can promote healing and closure for victims, "purging, to some extent, feelings of any felt need for retribution in a victim, a victim's family, or the community as a whole." *Chow*, 883 P.2d at 672.

¶101 Allocution is also an important element of procedural fairness. *See id.* ("[W]e regard allocution to be a significant aspect of the fair treatment which should be accorded a defendant in the sentencing process."). In cases where the defendant has been convicted at trial, allocution provides an opportunity for the defendant to either admit wrongdoing or maintain his innocence. And because many defendants choose to either plead guilty or exercise their constitutional right to remain silent at trial, allocution may be the only time that a defendant is an active participant in the court proceedings against them. *See* Kimberly A. Thomas, *Beyond Mitigation: Towards a Theory of Allocution*, 75 FORDHAM L. REV. 2641, 2642–43 (2007). As Maryland's highest court explained, "the allocutory process provides a unique opportunity for the defendant himself to face the sentencing body, without subjecting himself to cross-examination, and to explain in his own words the circumstances of the crime and his feelings regarding his conduct, culpability, and sentencing." *Harris v. State*, 509 A.2d 120, 127 (Md. 1986).[10]

¶102 Additionally, many courts have noted that affording the right to allocute preserves the perceived equity of the sentencing process. "Allocution provides a defendant the opportunity to meaningfully participate in the sentencing process and to show that he or she is a complex individual and not merely an object to be acted upon." *Chow*, 883 P.2d at 672 (cleaned up). As a court makes a sentencing decision, "the defendant's right to be heard must never

---

[10] Prior to 2022, Maryland's highest court was referred to as the Court of Appeals of Maryland. *See* MD. CONST. art. IV, pt. I, § 1 (1867). It has since been renamed the Maryland Supreme Court. *See* MD. CONST. art. IV, pt. I, § 1.

be reduced to a formality" and the court should "be cautious to avoid the appearance of dispensing assembly-line justice." *United States v. Barnes*, 948 F.2d 325, 331 (7th Cir. 1991). The personal nature of the right to allocute humanizes a procedure that could otherwise be a cold and perfunctory judicial action.

¶103  We have no way of assessing, nor does a defendant have any way of proving, the harm done to these interests when allocution is denied. We can only speculate as to whether allocution would have had a therapeutic effect on a defendant, would have aided in their rehabilitation or deterred others from engaging in similar conduct, and to what extent a defendant's allocution will have a positive impact on a victim. And we cannot assess the damage to public confidence when procedural fairness is not afforded in violation of a defendant's constitutional rights. But because these harms are not outcome determinative, they cannot be assessed under a traditional prejudice analysis.

### C. *The Traditional Policies Underlying the Preservation Rule Are Not as Strong in the Context of Allocution Errors*

¶104  Beyond the additional purposes of allocution explained above, the policies underlying the preservation rule are not as strong in cases of allocution error. This further supports our view that a traditional showing of prejudice should not be required in this narrow category of cases.

¶105 We have recognized two primary policies for the preservation rule. First, "in the interest of orderly procedure, the trial court ought to be given an opportunity to address a claimed error and, if appropriate, correct it." *Holgate*, 2000 UT 74, ¶ 11 (cleaned up). Ordinarily, our adversarial system charges parties with raising issues. *State v. Johnson*, 2017 UT 76, ¶ 14, 416 P.3d 443. But allocution is unique in that "it is the court which is responsible for raising the matter."[11] *Wanosik*, 2003 UT 46, ¶ 23. The obligation imposed on the district court requires that "both the defendant and counsel shall be

---

[11] Although our caselaw places the burden on the district court to affirmatively afford a defendant the opportunity to speak, that direction is not in the rule itself. The federal rule, in contrast, requires sentencing courts to "*address the defendant personally* in order to permit the defendant to speak or present any information to mitigate the sentence." FED. R. CRIM. P. 32(i)(4)(A)(ii) (emphasis added). Given the constitutional magnitude of the right at issue, we would support adding similar language to our rule 22.

affirmatively afforded an opportunity to make a statement, present any information in mitigation of punishment, or show any legal cause why sentence should not be imposed." *Id.* Thus, our usual insistence that the parties either bring the matter to the attention of the district court or establish an exception to preservation on appeal should give way when the court itself is charged with avoiding the error.

¶106 The second policy rationale for preservation is that it guards against the possibility that a party will deliberately choose to forgo an objection, knowing that it can be raised on appeal if the outcome is less favorable than hoped. *See Holgate*, 2000 UT 74, ¶ 11. But in the case of allocution, this scenario can be easily avoided if the district court simply complies with its affirmative obligation under rule 22(a). As the Supreme Court has stated "[t]rial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant" and "trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing." *Green*, 365 U.S. at 305. The burden of administering the right is minimal and simply requires the court to inquire of the defendant: "Do you, the defendant, . . . have anything to say before I pass sentence?" *Id.* at 303.

¶107 Although automatic reversal for allocution errors would undermine the legitimate interest in finality, that interest is not strong in this context. The remedy for a violation is simply a new sentencing hearing in which the defendant is properly afforded the right to allocute. An allocution error does not affect a guilty plea, nor does it overturn a guilty verdict. It does not require a new trial or present the possibility of acquittal.

¶108 In cases involving victims, we recognize that resentencing might be painful and places a particular burden on those victims who wish to exercise their rights to attend or be heard. But a defendant's allocution has the potential to benefit victims as well. *See supra* ¶ 72 n.6. A defendant who admits wrongdoing and expresses remorse can provide the victim, their family, or their community with some measure of closure. *See Chow*, 883 P.2d at 672. Correcting these errors promptly by filing a stipulated motion to remand for immediate resentencing would mitigate the impact on victims.

¶109 To that end, we support amending the Utah Rules of Criminal Procedure to provide a mechanism to promptly correct an allocution error in the district court to avoid the need for time

consuming and costly appeals. While a change to our rules will ensure that allocution errors are more easily remedied moving forward, we would not allow the error in this case to go uncorrected. James was denied his well-established right—a right guaranteed by the Utah Constitution—to address the court and offer any information in mitigation of his sentence. And the result in this case was far from a foregone conclusion where both the State and Adult Probation and Parole joined in recommending that James be granted probation. But regardless of the likelihood of a different outcome, James was denied his most meaningful opportunity to personally participate in the judicial proceedings against him. He was denied the opportunity to publicly express remorse for his actions, acceptance of responsibility, and a commitment to rehabilitation. The harm resulting from those lost opportunities cannot be measured by assessing the likelihood of a different sentence.

## CONCLUSION

¶110   In short, we believe the denial of the right to allocute is one of those rare instances in which "it is unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice." *State v. Arguelles*, 921 P.2d 439, 442 (Utah 1996) (cleaned up). We would instead adopt a per se rule of reversal and remand for resentencing.

―――――――――